FOURTH DIVISION
March 30, 2006

No. 1-04-1389

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01CR2559 |
| | ) | |
| DENNIS LIGON, | ) | The Honorable |
| | ) | Henry R. Simmons, Jr., |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE GREIMAN delivered the opinion of the court:

Following a jury trial, defendant Dennis Ligon was found guilty of aggravated vehicular hijacking and was sentenced to natural life in prison. On appeal, defendant contends (1) that he was not proven guilty beyond a reasonable doubt; (2) that there was a fatal variance between his indictment and the proof submitted at trial; (3) that his trial counsel was ineffective; (4) that he was denied a fair trial by comments made by the State in its closing argument; and (5) that section 33B-1 of the Criminal Code of 1961 (720 ILCS 5/33B-1 (West 2002)), pursuant to which defendant's sentence was extended, deprived him of his constitutional right to a jury and due process rights.

At trial, Ana Diaz testified that on December 16, 2000, at 1:15 p.m., she drove her red Ford 150 pickup truck into the Sears' parking lot at 6153 South Western Avenue in Chicago. As she was looking for a parking space, Diaz noticed defendant standing near a pile of snow. Diaz parked and was getting out of her truck when she was approached from behind by defendant, who blocked her into her truck and told her to leave the keys in the ignition and to get out. Defendant was very close to Diaz, looking at her in the eye. Diaz felt defendant pushing

something into her ribs.  When she heard a click, Diaz looked down and saw a gun in defendant's hand.  Diaz screamed, handed defendant her keys and moved away from the truck.  As defendant drove away in Diaz's truck, he hit another car.  Diaz borrowed a cellular phone to call the police.  Humberto Perez came to Diaz's assistance, following defendant for several blocks before losing him.  On January 3, 2001, Diaz went to the police station to view a lineup.  She identified defendant out of a lineup as the man who had stolen her truck.  Diaz recovered her truck.  At trial, Diaz made an in-court identification of defendant, identified defendant out of a picture of the lineup and identified a BB gun as the gun defendant had pushed into her ribs.  The picture and the gun were admitted into evidence.

Humberto Perez testified that on December 16, 2000, at 1:15 p.m., he was walking through the Sears' parking lot toward his car.  He noticed a man talking very closely to a woman getting out of a red truck.  When Perez got into his car, he heard a scream coming from the direction of the red truck. Perez drove over to Diaz, who told him that her truck had been stolen.  Perez followed the red truck for several blocks but lost the truck when it ran a red light.

Georgio Dawson, a 13-year-old boy, testified that he knew defendant through his mother.  On January 2, 2001, at 8 p.m., defendant was babysitting Dawson while his mother worked.  Defendant and Dawson went for a ride in defendant's red Ford truck.  Dawson had also ridden in the truck a few weeks earlier when defendant had taken Dawson and his mother grocery shopping.  Defendant and Dawson picked up a man Dawson described as "dark" and "bald" and then stopped while defendant talked to a woman named Tenita.  Defendant told Tenita that he would pick her up later in the evening.  Thereafter, defendant and Dawson dropped off the dark,

bald man and picked up defendant's son, Dennis Compton. Dawson testified that Compton looked like his father but was smaller in height and stature. After dropping Compton off, defendant and Dawson picked up Tenita. Defendant then dropped Dawson off at defendant's girlfriend's house. Defendant told Dawson that he would be back in 40 minutes to pick him up and would honk the horn when he got there. Several hours later, Dawson heard a horn honking and looked out of the window to see the red truck. Dawson went and got into the truck. Tenita was in the truck but defendant was not. Shortly thereafter, a police car approached the truck. The police officer told Dawson and Tenita to get out of the truck. The officer searched the truck and found a BB gun. Dawson identified the BB gun at trial. Dawson told the officer that the driver of the truck was named Dennis and went with the police to look for defendant. Defendant was found near an elevated train station. Dawson testified that, at all times, defendant was driving the truck and that he never witnessed Compton driving the truck.

Tenita Barber testified that, though she had seen defendant driving in a red truck several times at the end of December 2000, she first spoke with defendant on December 31, 2000. Barber next saw defendant driving the red truck on January 2, 2001, at 9 p.m. On that occasion, defendant was with Dawson and a man Barber also described as "dark" and "bald." Defendant told Barber that he would come back to pick her up at 10:45 p.m. and to come to the truck when she heard him honk. At about 11 p.m., Tenita heard defendant honking and got into the truck. Tenita testified that only defendant and Dawson, who defendant introduced as his stepson, were in the truck. Defendant and Tenita dropped Dawson off and proceeded to drive around, drinking alcohol and smoking marijuana. Defendant told Tenita that he had just bought the truck.

Eventually, defendant and Tenita drove back to where they had left Dawson. Defendant honked the horn but got out of the truck when Dawson did not come out of the apartment. After defendant had walked away from the truck, Dawson came out of the apartment and got into the truck. Shortly thereafter, the police arrived and asked Dawson and Barber to get out of the truck. As they were searching the truck, Barber heard the police officers say that they had found a BB gun. Barber was arrested and charged with criminal trespass to a vehicle.

Timako Cobb, Dawson's mother, testified that she met defendant in December 2000 and that, when he took her and her son to the grocery store in late December, defendant was driving a red Ford truck. On January 2, 2001, defendant offered to watch Dawson while Cobb was at work. On that day, defendant was still driving the red truck.

Officer Eric Helson testified that on January 3, 2001, at 5:10 a.m., he and his partner were on duty when they noticed another patrol car stopped near a red Ford truck. After talking to the officer who had arrived on the scene earlier and Dawson and Barber, Officer Helson and his partner took Dawson to look for defendant. Defendant was found standing near the entrance to an elevated train station about a block and a half from the red truck. A BB gun was recovered from the driver's side floor of the truck. Officer Helson identified the BB gun at trial.

Forensic scientist Debra McGarry, a specialist in latent fingerprints, was sent the BB gun, which she identified at trial, for latent print analysis. McGarry took steps to determine whether any prints on the gun were suitable for comparison and determined that there were no suitable latent prints. Because the grip of the BB gun was textured, McGarry testified that she did not expect to retrieve suitable prints.

1-04-1389

The parties stipulated that Diaz was the owner of the red Ford truck in which Barber and Dawson were riding.

The jury found defendant guilty of aggravated vehicular hijacking.

Following his trial, defendant filed a pro se motion for judgment notwithstanding the verdict. In his motion, defendant requested a hearing on the issues of whether he was charged with an unconstitutionally vague statute, whether the police had destroyed exculpatory evidence, whether he had been proven guilty beyond a reasonable doubt, and whether defense counsel was ineffective for failing to move to dismiss defendant's indictment, to move to quash defendant's arrest, to move to suppress suggestive identification evidence, to challenge the destruction of exculpatory evidence, to call witnesses to testify to the misidentification of defendant, and to consult with defendant prior to admitting defendant's guilt in the defense's opening statement.

The public defender also filed a motion for new trial on defendant's behalf, alleging that a new trial was warranted because of the State's prejudicial comments during closing, because defendant was not proven guilty beyond a reasonable doubt, and because no evidence was presented at trial that the BB gun was used as a bludgeon, as was averred in defendant's indictment. Thereafter, the public defender was allowed to withdraw and attorney Steven Decker was appointed to represent defendant.

Decker filed a supplemental motion for new trial which incorporated defendant's pro se motion and the public defender's motion. Decker additionally alleged that trial counsel was ineffective in failing to call Compton, as he indicated to the jury that he would during defendant's opening statement, and because the proof provided at trial regarding the BB gun

˘5˘

differed from the indictment.

At the hearing on the motion for new trial, public defender Anthony Thomas, who, along with Camille Calabrese, had represented defendant at trial, testified that prior to defendant's trial, he had reviewed the police reports and had developed a trial strategy of misidentification because the witnesses' descriptions of the perpetrator of the vehicular hijacking more closely resembled Compton than defendant. Thomas testified that he interviewed Compton twice, once on the first or second day of trial, and once on the next day. During the interviews, Compton's account of how he came into possession of the pickup was erratic, contradictory and inconsistent. At one point during the interviews, when Thomas pointed out that Compton's account was inconsistent, Compton asked Thomas "what do you want me to say?" This comment caused Thomas to believe that Compton would perjure himself if called to testify. Moreover, on the day that Compton was to testify, he was arrested in the courthouse for intimidating Dawson. Thomas was concerned that if Compton was called, the facts of that offense would come out before the jury and would harm defendant's case. Accordingly, Thomas testified that, after interviewing Compton, he formed the opinion that, due to the above-discussed considerations, Compton's inappropriate dress, tattoos, and use of street language, the jury would not view him as a favorable witness. Thomas expressed his opinion to defendant and indicated that, despite his reservations, he would call Compton to testify if defendant so requested. Defendant agreed that Thomas should not call Compton. Thomas acknowledged that he did not call Compton to testify, nor did he display Compton to the jury. Thomas additionally testified that he chose not to move to quash defendant's arrest and to suppress lineup evidence because he

did not believe there was sufficient evidence to sustain such motions and because he did not want to give away the defense's theory of the case prior to trial. Thomas indicated that defendant agreed with his decision.

Compton testified that he came to court during the trial with the intention of testifying on defendant's behalf. Compton testified that during his interviews with the public defenders, he did not indicate what his testimony would be. During the hearing, Compton indicated that he would have testified that neither he nor defendant committed the hijacking and that he had not witnessed who did. Compton admitted that, during the trial, he was arrested and pled guilty to communicating with the witness Dawson. Compton further admitted that he had previously been twice convicted of other crimes.

Defendant testified that he had not told Thomas not to file a motion to quash arrest and suppress evidence or not to call Compton. According to defendant, on the morning that he was arrested, he was on his way to visit Compton, who lived very close to where the truck was recovered and who had knowledge of the truck's provenance.

Following argument on the ineffective assistance issue and the other remaining issues, the trial court denied the motion for new trial. Defendant was sentenced to natural life in prison. Defendant appealed.

We first acknowledge the State's argument that several of defendant's contentions on appeal are waived because they were not raised at trial and in a posttrial motion. See People v. Enoch, 122 Ill. 2d 176, 186 (1988). We note that waiver is a limitation on the parties, not on this court (In re W.C., 167 Ill. 2d 307, 323 (1995)) and further find that, waiver aside, defendant's

several contentions do not warrant remand or reversal.

On appeal, defendant first contends that the State failed to prove aggravated vehicular hijacking beyond a reasonable doubt because it did not prove that he committed the offense with a dangerous weapon other than a firearm.

In assessing defendant's first contention, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) Jackson v. Virginia, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979).

Section 18-4(a)(3) of the Criminal Code of 1961, pursuant to which defendant was convicted, provides:

"(a) A person commits aggravated vehicular hijacking when he or she violates Section 18-3; and

\*\*\*

(3) he or she carries on or about his or her person, or is otherwise armed with a dangerous weapon, other than a firearm[.]" 720 ILCS 5/18-4(a)(3) (West 2000).

As in the Illinois armed robbery statute (720 ILCS 5/18-2(a) (West 2000)), the definition of the term "dangerous weapon" cannot be found in the aggravated vehicular hijacking statute. In People v. Thorne, 352 Ill. App. 3d 1062 (2004), in assessing the definition of the term in the context of the robbery statute, we wrote:

"[O]ur courts have defined the term by dividing objects alleged to be

'dangerous weapons' into four categories. [Citation.] The first category consists of objects that are dangerous *per se*, such as knives and loaded guns. [Citation.] The second category consists of objects that are never dangerous weapons, such as a four-inch plastic toy gun. [Citation.] The third category consists of objects that are not necessarily dangerous weapons but can be used as such, for instance, an unloaded gun or a toy gun made of heavy material, which are incapable of shooting bullets but can be used as a bludgeon [citation] or, as another example, fingernail clippers with a sharpened file [citation]. The fourth category consists of objects that are not necessarily dangerous but were actually used in a dangerous manner in the course of the robbery." Thorne, 352 Ill. App. 3d at 1070-71.

In Thorne, there was no evidence presented at trial that the BB gun the defendant used in the robbery at issue was loaded or was, in fact, used in a dangerous manner during the robbery. Accordingly, we found that BB gun fell within the third category and that "[t]herefore, whether the BB gun is a dangerous weapon is a question of fact to be resolved by the trier of fact." Thorne, 352 Ill. App. 3d at 1072, citing People v. Lindsay, 263 Ill. App. 3d 523, 528 (1994); People v. Flores, 245 Ill. App. 3d 149, 158 (1993). We determined that the evidence presented at trial was insufficient to support a finding that the BB gun could have been used as a dangerous weapon because no testimony was presented that the BB gun was actually used in a dangerous manner, no testimony was presented as to the BB gun's weight or metallic nature and "the State did not introduce the gun into evidence and provided no pictures for the trial court to view the makeup of the gun." Thorne, 352 Ill. App. 3d at 1073. Accordingly, we reversed the defendant's

1-04-1389

armed robbery conviction.

Defendant argues that the facts of the case at bar are analogous to those of <u>Thorne</u>. We disagree. The State did not argue at trial, nor does it here, that the BB gun was a dangerous weapon, *per se*. Moreover, there was no evidence presented at trial that the BB gun was actually used in a dangerous manner. So, as in <u>Thorne</u>, the BB gun in the present case fell into the third category of dangerous weapons. Case law provides that an unloaded BB gun may be a dangerous weapon if it can be used in a dangerous manner, for example, as a bludgeon. See <u>Thorne</u>, 352 Ill. App. 3d 1062; <u>People v. De La Fuente</u>, 92 Ill. App. 3d 525 (1981). The reasoning for such a rule was articulated in <u>People v. Skelton</u>, 83 Ill. 2d 58 (1980), in which the supreme court observed:

> "[M]any objects, including guns, can be dangerous and cause serious injury, even
>
> when used in a fashion for which they were not intended. Most, if not all,
>
> unloaded real guns and many toy guns, because of their size and weight, could be
>
> used in a deadly fashion as bludgeons. Since the robbery victim could be quite
>
> badly hurt or even killed by such weapons if used in that fashion, it seems to us
>
> they can properly be classified as dangerous weapons although they were not in
>
> fact used in that manner during the commission of the particular offense. It
>
> suffices that the potential for such use is present; the victim need not provoke its
>
> actual use in such manner." <u>Skelton</u>, 83 Ill. 2d at 66.

The question of whether the BB gun could be used as a dangerous weapon was a question of fact for the jury to determine. This case differs from <u>Thorne</u> because here, at trial, the BB gun was

admitted into evidence and was available for examination by the jury during deliberation.

Having examined the BB gun, which has been included in the record on appeal, we cannot say

that the jury's finding that it could have been used as a dangerous weapon was erroneous.

Defendant next contends that a fatal variance between the indictment and the proof of the

crime offered at trial requires reversal of his conviction.

Due process requires that an indictment must apprise a defendant of the precise offense

with which he is charged. People v. Alexander, 93 Ill. 2d 73, 79 (1982). A fatal variance

between the instrument charging a defendant and the proof pursuant to which defendant is

convicted at trial requires reversal of the defendant's conviction. People v. Johnson, 65 Ill. 2d

332, 337 (1976). "To be fatal, a variance between the charging instrument and the proof at trial

must be material and of such character that it misleads the accused in making his defense or

exposes him to double jeopardy." People v. Arndt, 351 Ill. App. 3d 505, 518 (2004).

Defendant was charged by indictment with one count of aggravated vehicular hijacking

on February 6, 2001. The indictment alleged that defendant

> "knowingly took a motor vehicle, to wit: a 2000 Ford, from the person or
>
> immediate presence of Anna [sic] Diaz, by the use of force or by threatening the
>
> imminent use of force and [defendant] was armed with a dangerous weapon, to
>
> wit: a bludgeon, in violation of Chapter 720 Act 5 Section 18-4(a)(3) of the
>
> Illinois Compiled Statutes 1992 as amended."

During his opening statement, the prosecutor stated that defendant

> "armed himself with the universal currency that no one can say no to, a pistol.

This pistol he brought with him, as you'll see, is in fact a BB gun. And as you see during this time it looks real enough."

Citing the above-quoted statement, defendant contends that the allegation contained in the indictment, that the dangerous weapon was a bludgeon, and what was proven at trial, that the dangerous weapon was an "imitation firearm," varied. He further alleges that the variance was material because he was prejudiced by it. Specifically, defendant alleges that, had he

"known he would have to defend himself against accusations that he used a BB gun as an imitation firearm, *** [he] would have adduced evidence regarding the BB gun's size, weight, and composition to establish that it was not a dangerous weapon. *** He also might have presented a much different closing argument, arguing the BB gun's lack of dangerousness instead of denying possession of the BB gun altogether."

The State replies that no variance exists. The State notes that no evidence was presented at trial to prove that the BB gun was dangerous because it was a firearm and that "the gun was admitted into evidence at trial and the jurors obviously determined for themselves that the gun could have been used as a bludgeon." The State argues, in the alternative, that any variance was not material because the particular kind of dangerous weapon with which defendant was armed was not essential to the charge of aggravated vehicular hijacking and because defendant's allegation that his defense would have been different had he known he was defending against an allegation that the BB gun was dangerous because it was a firearm is "nonsensical." The State observes that evidence relating to the BB gun's size, weight and composition "most readily

relate[s] to using the BB gun as a bludgeon - - not to using it as an imitation firearm."

We agree with the State that there is no variance between the indictment and what was proven at trial. At trial, the BB gun itself was admitted into evidence. Accordingly, the jurors were able to judge its size, weight and composition. As discussed above, the admission of the BB gun supported a finding beyond a reasonable doubt that defendant was armed with a dangerous weapon. No evidence was adduced, such as evidence that the BB gun was loaded or that it could cause bodily harm were it discharged by defendant, that would support a finding that the BB gun was a dangerous firearm. We conclude, therefore, that defendant's contention that his conviction should be reversed because the proof at trial showed that he was armed with a firearm while the indictment alleged that he was armed with a bludgeon is without merit.

Defendant's reliance on People v. Durdin, 312 Ill. App. 3d 4 (2000), in support of this contention is misplaced. In Durdin, the defendant was charged with one count of delivering cocaine within 1,000 feet of a school, a Class 1 felony, and one count of delivering heroin, a Class 2 felony, for a single transaction. At trial, the parties stipulated that the controlled substance at issue was heroin. Defendant was convicted of both counts. We reversed the defendant's conviction of delivery of cocaine, noting that the State conceded error and that the defendant had been wrongly convicted of delivery of cocaine because there was no proof at trial that the single transaction at issue had involved cocaine. Here, on the contrary, defendant was not convicted of the wrong crime. Moreover, the allegations of the indictment were, in fact, proven at trial.

Defendant next contends that he was denied effective assistance of counsel when his

attorneys stated in his opening statement that they would produce defendant's look-alike son Compton at trial and that they would show that Compton lived near where the truck was recovered, but failed to do so.

"To support a claim of ineffective assistance of counsel, a defendant must allege facts demonstrating that his attorney's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." People v. Patterson, 192 Ill. 2d 93, 107 (2000), citing Strickland v. Washington, 466 U.S. 668, 687, 695, 80 L. Ed. 2d 674, 693, 698, 104 S. Ct. 2052, 2064, 2068-69 (1984). Because a defendant must satisfy both prongs of the above-articulated test, failure to satisfy either prong precludes an ineffective assistance finding. People v. Shaw, 186 Ill. 2d 301, 332 (1998). In assessing an ineffective assistance claim, there is a strong presumption that counsel's actions were the result of sound trial strategy. People v. Coleman, 183 Ill. 2d 366, 397 (1998). While generally, the question of which witnesses to call to testify is a matter of trial strategy that is immune from claims of ineffective assistance of counsel (People v. Munson, 206 Ill. 2d 104, 139-40 (2002)), and "counsel need not call a witness if he reasonably believes that under the circumstances the individual's testimony is unreliable or would likely have been harmful to the defendant" (People v. Flores, 128 Ill. 2d 66, 106 (1989)), counsel's assistance may be ineffective if he promises that a particular witness will testify during his opening statement but does not provide the promised testimony during trial (see, e.g., People v. Oritz, 224 Ill. App. 3d 1065 (1992)). Nonetheless, "[a] counsel's failure to provide promised testimony is not ineffective assistance *per se*." People v. Manning, 334 Ill. App. 3d 882, 892

1-04-1389

(2002). Moreover, Case law suggests that the decision not to provide promised testimony may be warranted by unexpected events. See People v. Briones, 352 Ill. App. 3d 913, 918 (2004) (citing United States ex rel. Hampton v. Leibach, 347 F.3d 219, 257 (7th Cir. 2003), for the proposition that if counsel's failure to present promised testimony is not due to unforeseen events, it may be unreasonable).

Defendant analogizes the case at bar to Oritz. In Oritz, the defendant was charged with aggravated battery of his girlfriend. In opening, defense counsel stated that he would present evidence that the victim had another boyfriend and that, when that boyfriend was stopped for questioning by the police, he had two knives in his possession. During the State's case-in-chief, defense counsel attempted to cross-examine the victim about her other boyfriend but was precluded from doing so because his questions were beyond the scope of the State's direct examination of the witness. During the defendant's case-in-chief, defense counsel attempted to question his witness about the other boyfriend on redirect examination and was again precluded from doing so because his questions were beyond the scope of cross-examination. The defendant was found guilty by the jury. On appeal, we reversed the conviction, finding defense counsel ineffective. Defense counsel's representation fell below a reasonable level because he clearly misunderstood the fundamental rules of witness examination and the defendant was prejudiced by defense counsel's opening statements because they created an expectation on the part of the jury and because the case was close.

We find Oritz distinguishable and the facts of People v. Schlager, 247 Ill. App. 3d 921 (1993), closer to the facts of this case. In Schlager, the defendant was charged with the

attempted murder of his wife. In opening, defense counsel stated that the jury would hear testimony from the defendant and from experts who would testify that the defendant's actions were a result of a prescription drug the defendant had been taking. Defense counsel did not call the defendant or the experts to testify at trial and the defendant was found guilty. At a hearing on the defendant's posttrial motion alleging ineffective assistance, the defendant presented various experts to testify that prescription drugs had caused the defendant's actions and to show that defense counsel had not adequately investigated or defended the case. The trial court denied the defendant's motion. On appeal, we affirmed the trial court's judgment, finding that defense counsel had not shown a misunderstanding of the law, nor did he fail to subject the State's witnesses to vigorous cross-examination or make flawed legal arguments. On the contrary, the record of the hearing made clear that defense counsel's decision not to pursue the defense that the prescription drug had caused the defendant's actions was a matter of sound trial strategy because the scientific principles upon which such a defense was based were not solid and, in the absence of the defendant's testimony that he had actually taken the drugs, which he had not been prescribed but of which he had obtained samples, the defense could be given little weight. We further found that defense counsel was not ineffective in failing to call the defendant to testify because there were many ways in which the defendant's credibility could have been challenged.

Here, as in Schlager, sufficient evidence was presented at the hearing on defendant's posttrial motion to conclude that defense counsel's decision not to present Compton was one of sound trial strategy. During defense counsel's interviews of Compton, Compton's accounts of how he came to possess the truck were contradictory, leading defense counsel to believe that

Compton would perjure himself if called to testify. Defense counsel was also concerned that the facts of Compton's arrest for intimidation of Dawson would come out at trial, undermining Compton's credibility. Furthermore, in defense counsel's opinion, Compton's dress and use of street language would not endear him to the jury. At the hearing, Compton admitted that he had previously been convicted twice. He indicated that he would have testified at trial merely that neither he nor defendant hijacked the truck but that he did not know who did. Such vague testimony is unlikely to have bolstered defendant's case, particularly in light of the ways in which Compton's credibility may have been challenged and the evidence of defendant's guilt. Accordingly, in this case, unlike in <u>Oritz</u>, in which defense counsel's failure to provide promised testimony was clearly a product of his misunderstanding of the law, defense counsel's decision not to present Compton was a matter of trial strategy. Defendant's claim of ineffective assistance, therefore, fails.

Defendant also contends that defense counsel was ineffective for failing to properly investigate the case prior to trial when he did not interview Compton until after trial had begun. In support of this contention, defendant cites section 4-4.1 of the American Bar Association Standards for Criminal Justice, which is entitled "Duty to Investigate." Section 4-4.1(a) provides, in relevant part, "[d]efense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." ABA Standards for Criminal Justice 4-4.1(a) (3d ed. 1993).

We decline to adjudicate this contention. This issue was not specifically raised in defendant's posttrial motion and no evidence pertaining to this particular contention was elicited

during the hearing on the motion. For instance, the court did not hear evidence that Compton was, in fact, available to be interviewed prior to the commencement of trial. Consequently, we cannot determine from the record whether defense counsel's decision not to interview Compton until trial had commenced was a matter of necessity, because Compton was unavailable or some other extenuating circumstance existed, a matter of trial strategy or simply a result of incompetence.

> " 'Where the disposition of a defendant's ineffective assistance of counsel claim requires consideration of matters beyond the record on direct appeal, it is more appropriate that the defendant's contentions be addressed in a proceeding for postconviction relief, and the appellate court may properly decline to adjudicate the defendant's claim in his direct appeal from his criminal conviction.' " People v. Parker, 344 Ill. App. 3d 728, 737 (2003), quoting People v. Burns, 304 Ill. App. 3d 1, 11 (1999).

In a petition for rehearing, defendant raises the very closely related contention that defense counsel was ineffective because he did not have a reasonable basis to believe that Compton would testify when he made his opening remarks to the jury. In support of this contention, defendant cites section 4-7.4 of the American Bar Association Standards for Criminal Justice, entitled "Opening Statement," which provides "[d]efense counsel should not allude to any evidence unless there is a good faith and reasonable basis for believing such evidence will be tendered and admitted in evidence." ABA Standards for Criminal Justice 4-7.4 (3d ed. 1993).

1-04-1389

As with defendant's last contention, we refuse to address this contention because we find that it could more appropriately be addressed in a proceeding for postconviction relief. See Parker, 344 Ill. App. 3d at 737; Burns, 304 Ill. App. 3d at 11. Defendant did not raise this particular contention in his posttrial motion. At the hearing, Compton testified that he did not speak to defense counsel until the day of trial. Defense counsel testified that he had spoken with Ligon several times prior to trial and that he had specifically had spoken to defendant about Compton. Nonetheless, defense counsel was not asked about his reasons for his opening statement that Compton would testify. Accordingly, it is impossible for us, at this juncture, to determine whether, despite the fact that he had not yet interviewed Compton, trial counsel had some other reasonable basis to believe that Compton would testify.

Put another way, we simply cannot adequately address defendant's contentions that he was deprived of effective assistance of counsel by defense counsel's failure to interview Compton prior to the day of trial and whether defense counsel had a reasonable basis for stating in opening that Compton would testify. There is no evidence on the record concerning defense counsel's reasons for not interviewing Compton prior to the commencement of trial or the basis on which defense counsel believed, at the time the opening statement was made, that Compton would testify.

Defendant next contends that he was deprived of a fair trial by the cumulative effect of the State's erroneous closing comments.

We initially note that a prosecutor is given wide latitude in argument, may comment on the facts of the case and legitimate inferences that may be drawn therefrom and may discuss

1-04-1389

subjects of general knowledge, common experience, or common sense. People v. Beard, 356 Ill. App. 3d 236, 242 (2005).

> "[T]he defendant faces a substantial burden in attempting to achieve reversal based upon improper remarks made during closing argument. Although the prosecutor's remarks may sometimes exceed the bounds of proper comment, the verdict must not be disturbed unless it can be said that the remarks resulted in substantial prejudice to the accused, such that absent those remarks the verdict would have been different." People v. Byron, 164 Ill. 2d 279, 295 (1995).

The first comment to which defendant objects related to Dawson's testimony and was made in the State's rebuttal closing argument. The prosecutor stated:

> "The defense would have you believe that the State's Attorney talked to him for seven to eight hours, and you all know that that is not possible because the first day we were in here with you all.
>
>     ***
>
> The first day you all came in here I believe around 11:00 or 11:30, and we picked a jury that day. We were here with all of you. We were not sitting there putting words into Georgio Dawson's mouth, as they would have you believe. The second day Georgio was here in the morning. We spoke to him, but we were sitting here the rest of the day. To a 13 year old kid coming here, it is probably like going to the doctor, and it probably felt like seven to eight hours, but it wasn't."

˅20˅

Defendant contends that this comment was erroneous because it expressed the prosecutor's personal belief of Dawson's credibility and amounted to a testimonial statement by the prosecutor. The State responds that the comment was invited by defendant's closing comment that Dawson had been arrested and was not being charged because he cooperated with the State.

Defendant is correct that a prosecutor may not express personal beliefs or opinions, or invoke the integrity of his office to vouch for a witness's credibility. People v. Lee, 229 Ill. App. 3d 254, 260 (1992). Nonetheless, we disagree with defendant's assessment of these comments. At trial, in addition to testifying that, from his first interview until the time of his testimony, he had talked with the assistant State's Attorneys for seven or eight hours, Dawson testified that he arrived the day of jury selection after 9 a.m. and was allowed to leave at about 1 p.m. and that on that day, he did not talk to the assistant State's Attorneys the entire time he was at the courthouse. Dawson further stated that on the day he testified, he arrived after 9 a.m. Accordingly, the State's closing comment was not an endorsement of Dawson's testimony but was instead a comment and emphasis on his differing testimony.

Defendant also objects to the prosecutor's use of the words "ridiculous," "sad" and "pathetic" to describe the defense. Specifically, the prosecutor stated in the State's rebuttal closing argument:

> "You know, it's pathetic that the Defense has to attack an 11 year old boy, pathetic.
>
>                      ***
>
> Another ridiculous argument – and you will have this back with you. You

have all seen it already, but it's sad and pathetic that their argument is, well, because he had on two coats in Chicago on the 2nd day of January that he couldn't have been."

In People v. Kirchner, 194 Ill. 2d 502 (2000), the supreme court observed:

"The State may challenge a defendant's credibility and the credibility of his theory of defense in closing argument when there is evidence to support such a challenge. [Citation.] It is well established, however, that ' "*[u]nless based on some evidence*, statements made in closing arguments by the prosecution which suggest that defense counsel fabricated a defense theory, attempted to free his client through trickery or deception, or suborned perjury are improper. [Citations.]" ' " (Emphasis in original.) Kirchner, 194 Ill. 2d at 549, quoting People v. Jackson, 182 Ill. 2d 30, 81 (1998), quoting People v. Emerson, 97 Ill. 2d 487, 497 (1983).

We find the case at bar distinguishable from Emerson, upon which defendant relies. In Emerson, the supreme court reversed a conviction where the prosecutor had insinuated, during closing argument,

"that the defendant was guilty of improper conduct at the time of his arrest; stated that defense counsel has laid down a smokescreen 'composed of lies and misrepresentations and innuendoes' and attempted to 'dirty up the victim' to distract the attention of the jury from the defendant's crimes; and stated that if they could, defense counsel would deny that any death occurred, but since they

could not realistically do that, they had to 'make something up.' " <u>Byron</u>, 164 Ill.

2d at 296-97, quoting <u>Emerson</u>, 97 Ill. 2d at 496-98.

Here, unlike in <u>Emerson</u>, the prosecutor did not allege that defense counsel had deliberately lied to the jury or had fabricated a defense. Instead, we find that the objected-to comments were proper comments "on the credibility of the defendant and his theory of defense rather than an impermissible attack on defense counsel." <u>Kirchner</u>, 194 Ill. 2d at 549.

Defendant further contends that the prosecutor's closing remarks impermissibly denigrated the State's burden of proof. Defendant points to the prosecutor's statement:

"Our burden is beyond a reasonable doubt, not beyond all doubt, beyond a reasonable doubt. That is the burden that we embrace. It's a burden we're proud of. *** It's a burden that's met every single day in courtrooms. [Defense objection overruled.] It's a burden that's met every single day in courtrooms throughout [defense objection overruled] our fine country. It is a burden that we have met, and we're asking you to return the only true and just verdict, and that is to find the defendant guilty."

Comments by a prosecutor during closing statements which minimize the State's burden of proving guilt beyond a reasonable doubt by suggesting that the burden is merely a *pro forma* or a minor detail are improper. <u>People v. Frazier</u>, 107 Ill. App. 3d 1096, 1102 (1982). Nonetheless, comments nearly identical to those of the prosecutor in this case have consistently been found not to have reduced the State's burden of proof. See <u>People v. Moore</u>, 171 Ill. 2d 74, 103-04 (1996); <u>People v. Phillips</u>, 127 Ill. 2d 499, 528 (1989); <u>People v. Gacho</u>, 122 Ill. 2d 221,

1-04-1389

255 (1988); <u>People v. Bryant</u>, 94 Ill. 2d 514, 523 (1983); <u>People v. Brandon</u>, 243 Ill. App. 3d 515, 521 (1993). <u>People v. Starks</u>, 116 Ill. App. 3d 384 (1983), upon which defendant relies is distinguishable from the present case because there the prosecutor made the egregious comment that " 'there's nothing special going on here and *we don't have a burden*, no matter what [the defense attorney] would like you to think'." (Emphasis added.) <u>Starks</u>, 116 Ill. App. 3d at 395.

Having determined that none of the closing comments objected to by defendant were erroneous, we find that defendant's contention that he was denied a fair trial by the cumulative effect of the comments is also without merit. See <u>People v. Doyle</u>, 328 Ill. App. 3d 1, 15 (2002) ("[w]here the alleged errors do not amount to reversible error on any individual issue, there generally is no cumulative error").

Finally, defendant contends that pursuant to <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and <u>Shepard v. United States</u>, 544 U.S. __, 161 L. Ed. 2d 205, 125 S. Ct. 1254 (2005), his jury trial and due process rights were violated when the facts regarding the sequence and timing of his prior convictions, required for imposition of his extended natural life sentence by section 33B-1 of the Criminal Code of 1961 (720 ILCS 5/33B-1 (West 2002)), were not submitted to a jury or proven beyond a reasonable doubt.

Section 33B-1 provides that a person who has previously been twice convicted of a Class X felony, criminal sexual assault, aggravated kidnaping or first degree murder for two different offenses, shall be sentenced as for a third Class X felony, criminal sexual assault or first degree murder to natural life in prison provided:

"(1) the third offense was committed after the effective date of this Act;

1-04-1389

(2) the third offense was committed within 20 years of the date that

judgment was entered on the first conviction, provided, however, that time spent

in custody shall not be counted;

(3) the third offense was committed after conviction on the second

offense;

(4) the second offense was committed after conviction on the first

offense." 720 ILCS 5/33B-1 (West 2002).

In Apprendi, the Supreme Court discussed Almendarez-Torres v. United States, 523 U.S.

224, 140 L. Ed. 2d 350, 118 S. Ct. 1219 (1998), which held that a federal statute authorizing a

trial judge to enhance a defendant's sentence based on the fact of a prior conviction did not

violate the defendant's constitutional rights. The Apprendi Court held that "[o]ther than the fact

of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed

statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."

Apprendi, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. We have uniformly held

section 33B-1 to be constitutional because the facts required for an enhanced sentence fall within

the recidivism exception to the rule articulated in Apprendi. See, *e.g.*, People v. Pickens, 323 Ill.

App. 3d 429 (2001); People v. Boston, 324 Ill. App. 3d 557 (2001); Morissette v. Briley, 326 Ill.

App. 3d 590 (2001); People v. Jones, 328 Ill. App. 3d 233 (2002); People v. Allen, 335 Ill. App.

3d 773 (2002).

In Shepard, the Supreme Court recently revisited the issues raised in Apprendi. There the

defendant pled guilty to unlawful possession of a firearm by a felon. Under federal law, if the

defendant had been convicted of three prior serious drug offenses or violent felonies, he would be sentenced to an extended term in prison. A prior burglary committed in an enclosed space or building, or a "generic burglary," qualified as a violent felony, however, a burglary committed inside a boat or motor vehicle did not. The Shepard defendant had previously pled guilty four times to state burglary charges that did not differentiate between "generic burglary" and burglary committed in a boat or vehicle. The Supreme Court held that, under the federal statute, in order to determine whether a guilty plea was for "generic burglary," a sentencing court could look only to "the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information." Shepard, 544 U.S. at __, 161 L. Ed. 2d at 218, 125 S. Ct. at 1263. Writing for a plurality of the Shepard Court, Justice Souter articulated a constitutional reason for the Court's holding. Justice Souter wrote:

"[T]he Sixth and Fourteenth Amendments guarantee a jury standing between a defendant and the power of the state, and they guarantee a jury's finding of any disputed fact essential to increase the ceiling of a potential sentence. While the disputed fact here can be described as a fact about a prior conviction, it is too far removed from the conclusive significance of a prior judicial record, and too much like the findings subject to *** Apprendi, to say that Almendarez-Torres clearly authorizes a judge to resolve the dispute." Shepard, 544 U.S. at __, 161 L. Ed. 2d at 217, 125 S. Ct. at 1262.

This court has recently entertained allegations that section 5-5-3(c)(8) of the Unified

1-04-1389

Code of Corrections(730 ILCS 5/5-5-3(c)(8) (West 2002)), which, like the provision challenged here, requires a finding of facts concerning the sequence and timing of a defendant's prior convictions for a sentencing judge to impose an enhanced sentence, is unconstitutional in light of Shepard. See People v. Yancy, No. 1-04-2605 (December 29, 2005); People v. Rivera, No. 1-04-2326 (December 16, 2005). In Yancy and Rivera we found that the Shepard "holding was narrowly drawn to apply to scenarios that required findings of fact related to the elements of an underlying crime that would make such crimes predicate offenses for the purposes of enhancing a sentence." Rivera, slip op. at 9. We further noted that, after Shepard, the recidivism exception to Apprendi remains viable. Moreover, the "fact of a prior conviction," which may be found by a sentencing court, includes facts intrinsic in the conviction, such as its timing and its sequence in relation to other convictions. Accordingly, we held that section 5-5-3(c)(8) of the Unified Code of Corrections was not unconstitutional.

We adopt the reasoning of Yancy and Rivera and find that section 33B-1 of the Criminal Code of 1961 is constitutional because the timing and sequence of a defendant's prior convictions are inherent in the convictions themselves and need not be submitted to a jury.

For the above-stated reasons, we affirm the judgment of the trial court.

Affirmed.

QUINN, P.J., and CAMPBELL, J., concur.