2025 IL App (2d) 240565
No. 2-24-0565
Opinion filed December 15, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-CF-202 |
| GREG ALGRIM, | ) ) ) | Honorable David P. Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE KENNEDY delivered the judgment of the court, with opinion.
Justices McLaren and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, defendant, Greg Algrim, was convicted of 19 counts of theft (720 ILCS 5/16-1(a)(1)(A) (West 2020)). The alleged thefts arose from defendant's use of his employer's scheduling software, which showed that, on numerous occasions over the course of two years, he added hours that he had not worked to his schedule and was subsequently paid for those hours. The trial court sentenced defendant to three years' probation and ordered him to pay $17,211.52 in restitution. Defendant appeals, arguing that the use of the term "United States Currency" in the indictment created a fatal variance between the indictment and the proof at trial. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3      Defendant worked as a firefighter for the Elburn and Countryside Fire Protection District (District) until September 20, 2021, when he was placed on paid administrative leave pending the District's inquiry into discrepancies between the hours he had been paid for and the hours he had actually worked. The police interviewed defendant on September 30, 2021, and he subsequently resigned on November 25, 2021. On July 20, 2022, a grand jury indicted defendant on 20 counts of theft that occurred between August 2, 2019, and September 10, 2021. Each count specified that defendant "knowingly obtained unauthorized control over the property of the owner, [the District], being United States Currency, with the intent to permanently deprive the owner of the use or benefit of said property." Count I alleged that the theft occurred "on or between August 2, 2019[,] through September 10, 2021," and each of the remaining counts alleged a single offense date between August 2, 2019, and September 10, 2021. The counts alleged both felonies and misdemeanors, based on the value of the currency stolen. The State nol-prossed count XIV before trial. Defendant waived his right to a jury trial, and a bench trial was held over the course of four days in 2024: February 1 and 2, March 21, and April 9.

¶ 4      The State first called Merry Morris, who had worked as a financial specialist for the District for nearly 12 years. In that role, Morris processed payroll for the District. When asked to describe her role in the payroll process, Morris stated:

> "Once I was advised that the timecards had been looked at [by supervisors], then I would pull the schedule from the scheduling software and download that into an Excel spreadsheet, and then I would look over the spreadsheet for any obvious anomalies or errors, and then that was downloaded into the payroll company's software so that checks could be written."

Morris went on to explain that the scheduling software tracked all the hours that employees worked (including overtime), vacation, and sick days. Defendant was one of three employees who had administrator privileges with the scheduling software. Morris said she had no way to check whether employees worked the number of hours listed; she "wasn't there, so [she] had no means of doing that." Employees were paid every other Friday and were required to report their hours by Monday morning preceding a payday. The hours reported by employees had to be approved by their "officers." All payments were made by direct deposit.

¶ 5        After defendant was placed on administrative leave, Assistant Chief Michael Huneke asked Morris to assist in investigating defendant. Morris looked back through the hours reported in the scheduling system and compared those hours to defendant's wage statements or pay stubs. The State offered into evidence defendant's wage statements spanning from July 2019 to September 2021, showing amounts that were directly deposited into an account identified only by the last four digits of the account number. Defense counsel objected that foundation was lacking for the wage statements because each one bore only a partial account number and did not show the name of the transferee bank. Thus, according to counsel, there was "absolutely no evidence that any money was actually transferred." Counsel argued that the State needed to produce statements from both banks, reflecting an actual transfer of funds. The trial court overruled the objection, holding that foundation was established for the wage statements and that the weight to be given them, "in the picture of the totality of the case[,] remain[ed] to be seen."

¶ 6        Morris further testified that only the employee who earned the wages could control which account received the direct deposit. When asked whether defendant had ever notified her that he had been underpaid or overpaid, Morris responded, "Not that I recall." When asked whether, in her examination of payroll records for other employees, she ever discovered discrepancies similar

to those in defendant's records, she replied, "Not that I recall." At no time did defendant tell Morris that he had deleted time entries after payroll had been paid.

¶ 7    The State next called Maggie Walsh, who worked for the District as a data specialist. She oversaw the District's records management systems. She confirmed that the District's scheduling software required a username and password and that defendant had administrator rights, which allowed him to approve time entries and add or delete hours on his own schedule and those of other employees. The State introduced into evidence multiple reports that Walsh generated from the scheduling software. Among these were logs of entries that pertained to defendant, including entries that defendant himself made. Walsh also received subpoenas from the defense and compiled records in response to those requests. In the process of compiling those records, Walsh viewed the user database for the scheduling software and saw that defendant had full administrator rights.

¶ 8    Walsh also had access to the District's "duty roster," which showed who was working each day and which rig each person was assigned to. Duty rosters for the relevant dates were admitted into evidence. Walsh also testified about reports generated for the National Fire Incident Reporting System (NFIRS). For each incident the District responded to, the NFIRS report detailed the circumstances of the incident as well as the District personnel and equipment involved. NFIRS reports for the relevant dates were admitted into evidence. Walsh noted that the NFIRS reports showed days when defendant did not respond to calls, although the scheduling software indicated he worked those days. On cross-examination, Walsh stated that the NFIRS reports would not reflect the time defendant spent attending meetings or in training.

¶ 9    The State next called Huneke, who had served as the District's assistant fire chief during the relevant time period. Huneke and defendant had started working at the District around the same

time in 2002 and worked together for almost 20 years. Huneke was defendant's supervisor at the time he was placed on administrative leave "pending an investigation on payroll discrepancies."

¶ 10    Huneke testified that, on September 10, 2021, defendant informed him that an employee of the District had not received overtime pay for a particular day. When Huneke accessed the scheduling software to investigate the issue, he happened to notice that defendant appeared on the schedule as a fourth medic on the day in question. Huneke explained that, typically, only three medics were assigned to each ambulance. Huneke verified that defendant received pay for working that day. Huneke then texted defendant to ask if he had been paid for working that day. Defendant replied that he was unsure whether he had been paid, but if he had, it was a mistake and the money should be deducted from his next paycheck. Huneke notified Joe Cluchey, the fire chief at the time, of defendant's payroll discrepancy. Cluchey instructed Huneke to examine the entire payroll for other discrepancies. Huneke found two additional payroll discrepancies, both for wages paid to defendant. Huneke did not find discrepancies for any other employee.

¶ 11    On September 20, 2021, Huneke and Cluchey gave defendant notice of paid administrative leave, pending further investigation into the payroll discrepancies. Defendant signed the notice with his union representative present. Huneke testified that the notice indicated the District would conduct an official investigation and hold a formal inquiry into the situation. Huneke said that defendant asked to speak to the chief privately, but the chief denied that request. Huneke also said that, as defendant signed the notice, he commented that he had known the chief long enough to know that, if the chief was placing him on leave, the chief had the evidence he needed. Defendant also commented that it was "22 years down the drain."

¶ 12    Huneke went on to testify about specific pieces of data in evidence. For instance, Huneke was shown the schedule, duty roster, and NFIRS report for Wednesday, July 24, 2019. Defendant

did not appear in the duty roster or NFIRS report for that date. The log for the scheduling software showed that, on July 29 at 7:45 a.m., defendant signed into the scheduling software. At 7:57 a.m., defendant added himself to the schedule as a medic for voluntary overtime from 7 a.m. on July 24 to 7 a.m. on July 25. Payroll processing occurred the following Monday, July 29. On August 2, defendant signed into the scheduling software and deleted the 24-hour overtime shift that he had added. Huneke went on to testify about other discrepancies in the reports that inflated defendant's pay. Huneke stated that his investigation found no discrepancies affecting other employees.

¶ 13    The parties stipulated to the foundation of defendant's recorded interview with Detective Jonathan Shepard at the Elburn Police Department on September 30, 2021. At the start of the interview, Detective Shepard asked, "So, we cut to the chase, you know [we're] talking about this payroll discrepancy, right?" and defendant agreed by saying, "Yep." When told that his recorded and time-stamped additions and deletions in the scheduling software had inflated his wages, defendant said, "I'm not disputing any of that, I'm just telling you that I did not intentionally do any of this." Defendant said, "I understand how it looks on paper." He also admitted that "it looks very bad." He went on to say, "I take 100% responsibility for not checking my paystubs and not reporting that I deleted some of the hours *** after payroll [was processed]." When Detective Shepard expressed disbelief that defendant could have unintentionally made so many changes to his own schedule over the course of two years, defendant reiterated that, although he could not dispute that he made the changes, he had not made the changes intentionally.

¶ 14    After the State rested, defendant made a motion for a directed finding. Defendant first argued that the State, by presenting only wage statements and no bank statements, failed to prove that the District owned the property (allegedly, money) in question and that the property was transferred to defendant such that he gained control over it. Defendant next argued that the State

alleged in the indictment—and therefore needed to prove—that defendant obtained unauthorized control of "United States currency." Defendant cited sources suggesting that "currency" refers to "bills and coins." Defendant went on to assert that the State needed to prove a transfer of currency, and that if the State were to argue in rebuttal "that it was a bank transfer, then they're admitting then there was no currency transfer. They cannot have it both ways." In rebuttal, the State argued that "currency" means "money," and that the language in the indictment put defendant on notice of the charges. The State recounted the evidence that had been presented at trial and highlighted the statements from defendant's recorded interview that acknowledged culpability, such as, " 'I wish you could tell me a dollar amount and I could pay it all back, ***.' "

¶ 15    The trial court denied the motion for a directed verdict. In response to defendant's argument regarding "the sufficiency of the indictments and the language used in the indictments," the court found that the property at issue "is United States currency because it flows from one source to another source—to a bank account where it can be used as United States currency." In response to defendant's argument that the State needed to provide bank statements or additional proof of the transfer of funds, the court stated,

> "When you look at the totality of the circumstances, especially at this point viewing the evidence in the light most favorable to the State, the defendant in this case was working, was getting paid, never complained that he didn't get paid, or that his payroll statements were wrong. So the argument that those payroll statements are insufficient to show that money actually changed hands *** is without merit."

The court then denied the motion and the defense rested.

¶ 16    Following closing arguments, the trial court again addressed defendant's argument regarding use of the term "United States currency." The court found that defendant "has available

*** more money than he had had he not done this, and he has access to that through a bank, through an ATM, through cashing checks, through writing checks. So he has access to United States currency as a result of these crimes." The court also addressed once more defendant's argument that the State needed to prove that he received his wages, stating, "That just defies logic to suggest that he wasn't getting paid, this money wasn't coming to him. It's obvious that he did this. He knows that he did this based on his statement."

¶ 17     The trial court found defendant guilty on all counts. The court later sentenced him to three years' probation and ordered him to pay $17,211.52 in restitution. Defendant now appeals.

¶ 18                                    II. ANALYSIS

¶ 19     On appeal, defendant contends that the use of the term "United States Currency" in the indictment created a fatal variance between the indictment and the proof at trial. Defendant argues that "currency" strictly refers to coins and bills and that therefore the indictment must be read to allege that he took money from his employer in the form of cash. In contrast, defendant stresses, the evidence at trial showed that he took money from his employer by inflating his wages, which were then paid to defendant through electronic funds transfers. Notably, although defendant argues that this variance is material, he fails to assert that the variance prejudiced him by misleading him in making his defense or exposing him to double jeopardy. In response, the State argues that the variance is not material and that, even if it were material, defendant's claim on appeal cannot succeed because the variance did not prejudice him. We agree with the State.

¶ 20     "The State must prove the essential elements of the charging instrument as alleged and without variance." *People v. Miller*, 253 Ill. App. 3d 1032, 1036 (1993). The essential elements of theft under section 16-1(a)(1)(A) of the Criminal Code of 2012 (720 ILCS 5/16-1(a)(1)(A) (West 2020)) are (1) obtaining or exerting unauthorized control over property of the owner and

(2) intending to deprive the owner permanently of the use or benefit of the property. See *People v. Patrick*, 38 Ill. 2d 255, 258 (1967) (holding that the essential elements of theft are (1) the act of obtaining unauthorized control over property of the owner and (2) the intent to deprive the owner permanently of the use or benefit of the property). "A fatal variance between the instrument charging a defendant and the proof pursuant to which [the] defendant is convicted at trial requires reversal of the defendant's conviction." *People v. Ligon*, 365 Ill. App. 3d 109, 117 (2006). "For a variance between the charging instrument and the proof at trial to be fatal, the difference 'must be material *and* be of such character as may mislead the defendant in making his or her defense, or expose the defendant to double jeopardy.' " (Emphasis added.) *People v. Lattimore*, 2011 IL App (1st) 093238, ¶ 67 (quoting *People v. Maggette*, 195 Ill. 2d 336, 351 (2001)). If "the essential elements of an offense are properly charged but the *manner* in which the offense is committed is incorrectly alleged," the error is one of form rather than substance; thus, the variance is not material. (Emphasis added.) *People v. Okoro*, 2022 IL App (1st) 201254, ¶ 43. Likewise, if, despite a variance, the evidence at trial was sufficient to prove the essential elements of the alleged offense, the sufficiency of the evidence is not at issue. See *Lattimore*, 2011 IL App (1st) 093238, ¶ 68 (holding that the sufficiency of the evidence was not at issue where the trial evidence varied from the indictment over the manner in which the battery was committed, but the evidence proved the essential elements of aggravated battery).

¶ 21    Section 111-3(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/111-3(a) (West 2020)) enumerates the general requirements for a valid charging document:

> "(a) A charge shall be in writing and allege the commission of an offense by:
>
> (1) Stating the name of the offense;
>
> (2) Citing the statutory provision alleged to have been violated;

> (3) Setting forth the nature and elements of the offense charged;
>
> (4) Stating the date and county of the offense as definitely as can be done; and
>
> (5) Stating the name of the accused, if known, and if not known, designate the accused by any name or description by which he can be identified with reasonable certainty."

¶ 22    Here, each count of the indictment (1) charged defendant with committing the offense of theft, (2) "in violation of Chapter 720, Act 5, Section 16-1(a)(1)(A) of the Illinois Compiled Statutes as amended," (3) by "knowingly obtain[ing] unauthorized control over the property of the owner, [the District], being United States Currency, with the intent to permanently deprive the owner of the use or benefit of said property," and listed the value range of the property as well as (4) the date of the offense and the county where the offense was committed, and (5) defendant's name.

¶ 23    Defendant argues that the use of the term "United States Currency" in the indictment created a fatal variance between the indictment and the evidence produced at trial. We disagree. First, due to the obvious fact that the misappropriated funds could be cashed out in United States currency, defendant has identified a *de minimis* discrepancy in the characterization of the property obtained. See *Brown v. State*, 692 S.E.2d 9, 11-12 (Ga Ct. App. 2010) (the indictment alleged that the defendant, a government employee, "unlawfully took United States currency," but the evidence at trial showed that the defendant falsified purchase requests to pay for her college courses; "[t]he inclusion of the word 'currency' in the indictment was not an essential element of the offense and did not create a fatal variance *** since a purchase order authorizing the expenditures of funds, like currency, is a method of payment").

¶ 24 Second, to the extent that the indictment must be understood to allege strictly that defendant acquired the funds *in the form of cash*, he has identified at most a variance in the manner in which the offense was committed. However, because the essential elements of the offense were properly charged, a variance in the manner of commission is a matter of form rather than substance and, thus, is not material. See *People v. Simpkins*, 48 Ill. 2d 106, 107, 109-11 (1971) (the State charged the defendants with mob action for disturbing the peace by firing a revolver, but the State ultimately produced no evidence that any of them fired a weapon and relied instead on evidence that they engaged in gang fighting; however, there was no material variance because the reference to firing a revolver was "surplusage"; "[t]he particular means by which each defendant participated in the creation of the disturbance was not critical, and the fact that none of the individual defendants had fired a revolver was immaterial"); *Lattimore*, 2011 IL App (1st) 093238, ¶¶ 1, 70 (the indictment charging aggravated battery alleged that the defendant " 'struck' " the victim, a store security officer, but the evidence established, more precisely, that the defendant "caused [the victim] to be 'struck' " by resisting the victim; however, the variance was not material, as it related only to the manner in which the defendant caused bodily harm).

¶ 25 Because defendant's argument cannot succeed unless the variance is material, our inquiry could end here. Nonetheless, we next consider whether the variance prejudiced defendant by (1) misleading him in making his defense or (2) exposing him to double jeopardy. As to the first consideration, defendant fails to explain how he was misled in making his defense. See *Simpkins*, 48 Ill. 2d at 107, 110-11 (where the indictment charged the defendants with mob action based on their acts of disturbing the peace by firing a revolver, but the evidence instead showed that none of the defendants had a revolver, there was no prejudice because the defendants did not suggest that their testimony was inaccurate or that they omitted evidence because of the variance).

Furthermore, we find it implausible that defendant could make such an argument. By the time defendant was charged with theft on July 20, 2022, he had already (1) been placed on administrative leave, (2) been interviewed by the police, and (3) resigned from his position with the District. The indictment was the culmination of an ongoing investigative process that had begun nearly a year earlier. Also, defendant's recorded police interview on September 30, 2021, makes it clear that he was aware of the nature of the alleged conduct. When Detective Shepard asked, "So, we cut to the chase, you know [we're] talking about this payroll discrepancy, right?" defendant agreed by saying, "Yep." Over the course of the next 40 minutes, defendant and Detective Shepard spoke about (1) the scheduling software that defendant used to enter his hours worked, (2) defendant's password-protected access to that software, and (3) the evidence showing that defendant had added hours to his schedule just before payroll processing and deleted those hours just after payroll processing. In addition, the discovery process would have made defendant well aware of the nature of the evidence that would be used against him. Therefore, we find that defendant cannot plausibly argue that the inclusion of the term "United States Currency" in the indictment misled him in preparing his defense.

¶ 26    Defendant relies heavily on *People v. Durdin*, 312 Ill. App. 3d 4 (2000). In *Durdin*, the defendant was convicted of delivering cocaine within 1,000 feet of a school, although the parties stipulated that the controlled substance at issue was heroin. *Id.* at 4-5, 7. The court held that "the variance *** was material because it [concerned] the controlled substance allegedly delivered, an element of the charge in [the] count." *Id.* at 7. The court noted that the State "was required to prove that [the] defendant knew he was delivering cocaine." *Id.* On the issue of prejudice, the court said that it "[could not] speculate how [the] defendant may have changed his defense if the proof at

trial had been cocaine." *Id.* Therefore, the court "[could not] say \*\*\* that no actual prejudice or no realistic possibility of prejudicial uncertainty existed." *Id.*

¶ 27    While *Durdin* is arguably distinguishable on both materiality and prejudice, it is sufficiently distinguishable based on prejudice alone. Unlike the *Durdin* court, we are not left to speculate on prejudice. Defendant clearly was not prejudiced because he knew, despite the mention of "United States Currency," that the State was prosecuting him for unauthorized electronic funds transfers, as demonstrated by defendant's statement to police that he wished he "could pay it all back."

¶ 28    Although defendant does not argue the point, we consider whether the use of the term "United States Currency" could expose defendant to double jeopardy. In determining whether defendant's conviction could be used as a bar to further prosecution, we consider not only the charging instrument but also the evidence at trial. See *People v. DiLorenzo*, 169 Ill. 2d 318, 325 (1996). Here, the State presented extensive evidence in the form of computer-generated records and reports to support each charge of theft of which defendant was convicted. Defendant's access to the scheduling software was password-protected, and the software recorded his entries each time he logged in. In light of the detail and specificity of the evidence produced at trial, defendant cannot plausibly argue that the inclusion of the term "United States Currency" in the indictment could expose him to double jeopardy.

¶ 29    Because any variance created by the term "United States Currency" is not material and because defendant has not argued—and cannot argue—that the variance prejudiced him, defendant is not entitled to relief. And even if we suppose that defendant's argument on appeal implicitly challenges the sufficiency of the evidence in light of the variance, the argument fails because the State need only present evidence to prove the essential elements of the offense, which clearly it

did. See *Lattimore*, 2011 IL App (1st) 093238, ¶ 68. Therefore, we have no basis for vacating his conviction.

¶ 30                                    III. CONCLUSION

¶ 31     For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 32     Affirmed.

*People v. Algrim*, **2025 IL App (2d) 240565**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 22-CF-202; the Hon. David P. Kliment, Judge, presiding. |
| **Attorneys for Appellant:** | Matthew J. Haiduk, of Geneva, for appellant. |
| **Attorneys for Appellee:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Adam J. Rodriguez, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |