THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DENNIS LIGON, Defendant-Appellant.

First District (3rd Division)    No. 1—07—1991

Opinion filed June 24, 2009.

Michael J. Pelletier, Patricia Unsinn, and Patrick F. Cassidy, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita Alvarez, State's Attorney, of Chicago (James E. Fitzgerald, Mary P. Needham, and Owen D. Kalt, Assistant State's Attorneys, of counsel), for the People.

JUSTICE QUINN delivered the opinion of the court:

Following a jury trial, defendant, Dennis Ligon, was found guilty of aggravated vehicular hijacking (720 ILCS 5/18—4(a)(3) (West 2004)) and sentenced to natural life in prison as an habitual offender. On direct appeal, this court affirmed defendant's conviction and sentence but declined to rule on two of his claims regarding ineffectiveness of his trial counsel, finding that those issues could be more appropriately

addressed in a proceeding for postconviction relief. *People v. Ligon*, 365 Ill. App. 3d 109 (2006). The defendant filed a *pro se* postconviction petition, but did not raise the two issues that this court declined to adjudicate. The circuit court summarily dismissed defendant's postconviction petition, and this appeal followed. On appeal, defendant contends that the due process and equal protection clauses of the constitution required that defendant have legal counsel appointed to assist him in preparing his postconviction petition. For the reasons set forth below, we affirm.

## I. BACKGROUND

Defendant's trial on a charge of aggravated vehicular hijacking was held on April 2 and 3, 2003. The defendant was represented by assistant public defenders (APD) Anthony Thomas and Camille Calabrese. On April 2, 2003, before opening statements, APD Thomas informed the court that he intended to call defendant's son, Dennis Compton, as a witness, stating that he had interviewed Compton for the first time the previous day. The prosecutor did not object, stating that she also had the opportunity to speak with Compton the day before.

In her opening statement, APD Calabrese told the jury that this would be a "text book case of misidentification," stating that the jury would hear that defendant's son, Dennis Compton, is almost his father's look-alike and that the jury would learn that "the actual story behind this case is of a father who is protecting his son." APD Calabrese told the jury "we believe we are going to be able to produce Dennis Compton for you" and expressed confidence that, after hearing Compton's testimony, the jury would have a reasonable doubt as to defendant's guilt. Defense counsel said that defendant "may be guilty of protecting his son[,] but that doesn't mean that he's guilty of having [taken] this automobile."

The State presented several witnesses at trial. Ana Diaz testified that on December 16, 2000, at 1:15 p.m., she drove her red Ford pickup truck into the Sears parking lot at 6153 South Western Avenue in Chicago. Diaz parked and was getting out of her truck when defendant approached from behind, blocked her into her truck, and told her to leave the keys in the ignition and get out. Diaz felt defendant push something into her ribs. Then she heard a click, looked down and saw a gun in defendant's hand. Diaz screamed, handed defendant her keys and moved away from the truck. Defendant got in the truck and drove away. On January 3, 2001, Diaz went to the police station to view a lineup. She identified defendant as the man who stole her truck and made an in-court identification of defendant at trial

Humberto Perez testified that on December 16, 2000, at 1:15 p.m., he was walking to his car in the Sears parking lot. When Perez got into his car, he heard a scream coming from the direction of a red truck. Perez drove over to Diaz, who told him that her truck had been stolen. Perez followed the red truck for several blocks but lost it when it ran a red light. Perez was not able to identify defendant as the man in the truck but testified that the offender was an African-American man with a light complexion and 5 feet 9 inches or 6 feet tall.

Georgio Dawson, a 13-year-old boy, testified that he knew defendant through his mother. On January 2, 2001, at 8 p.m., defendant was babysitting Dawson while his mother was at work. Defendant and Dawson went for a ride in defendant's red Ford truck. Dawson had also ridden in the truck a few weeks earlier when defendant drove Dawson and his mother to the grocery store. Defendant and Dawson picked up a man Dawson described as "dark" and "bald" and then stopped while defendant talked to a woman named Tenita. Defendant told Tenita that he would pick her up later that evening. Defendant and Dawson then dropped off the dark, bald man and picked up defendant's son, Dennis Compton. Dawson testified that Compton looked like his father but was smaller in height and stature. After dropping Compton off, defendant and Dawson picked up Tenita. Defendant then dropped Dawson off at defendant's girlfriend's house and told Dawson he would be back in 40 minutes to pick him up. Several hours later, Dawson heard a horn honking, looked out of the window and saw the red truck. Dawson got into the truck and saw that Tenita was in the truck, but defendant was not. Shortly afterwards, a police car approached, and the police officer told Dawson and Tenita to get out of the truck. The officer searched the truck and found a BB gun. Dawson identified the BB gun at trial. Dawson told the officer that the driver of the truck was named Dennis and went with the police to look for defendant, who was found near an elevated train station. Dawson testified that, at all times, defendant was driving the truck and that he never saw Compton driving the truck.

Tenita Barber testified that, though she had seen defendant driving a red truck several times at the end of December 2000, she first spoke with defendant on December 31, 2000. Barber next saw defendant driving the red truck on January 2, 2001, at 9 p.m. Defendant was with Dawson and a man whom Barber also described as "dark" and "bald." Defendant told Barber that he would come back to pick her up at 10:45 p.m. Tenita testified that when defendant returned to pick her up at about 11 p.m., only defendant and Dawson, whom defendant introduced as his stepson, were in the truck. Defendant and Tenita dropped Dawson off and then drove around,

drinking alcohol and smoking marijuana. Defendant told Tenita that he had just bought the truck. A few hours later, defendant and Tenita drove back to pick up Dawson. Defendant honked the horn but got out of the truck when Dawson did not come out of the apartment. After defendant had walked away from the truck, Dawson came out and got into the truck. Shortly afterwards, the police arrived and asked Dawson and Barber to get out of the truck. As they were searching the truck, Barber heard the police officers say that they found a BB gun. Barber was arrested and charged with criminal trespass to a vehicle.

Officer Eric Helson testified that on January 3, 2001, at 5:10 a.m., he and his partner were on duty when they noticed another patrol car stopped near a red Ford truck. After talking to the officer who had arrived on the scene earlier and Dawson and Barber, Officer Helson and his partner took Dawson to look for defendant. Defendant was found standing near the entrance to an elevated train station about a block and a half from the red truck. Officer Helson stated that the defendant identified himself as "Dennis," and he was placed under arrest.

During its case, the defense did not call defendant's son, Dennis Compton, to testify or otherwise display his likeness to the jury. In his closing argument, APD Thomas stated "Ms. Calabrese told you in the beginning that this was a classic case of misidentification. That is what this case is about. *** According to Tanita [sic] Barber she says that Compton is 5, 8. Well that's pretty close to the Dennis she's describing, but not to Dennis Ligon. When you saw him just now, you could see that he is closer to 6, 1 not 5, 9 or 5, 8 like Dennis Compton. There was a Dennis there, but it wasn't Dennis Ligon."

In its closing statement, the State told the jurors that "what you heard at the start of this trial by Defense Counsel was that you were going to hear about a classical case of misidentification. *** A classical case of misidentification? Where is the evidence of that?"

After deliberations, the jury found the defendant guilty of aggravated vehicular hijacking. Defendant filed a *pro se* motion for judgment notwithstanding the verdict on the grounds that he was charged with an unconstitutionally vague statute, that the police knowingly destroyed exculpatory evidence, and that he had not been proven guilty beyond a reasonable doubt. Defendant also requested a hearing on whether defense counsel was ineffective for not moving to dismiss defendant's indictment, quash defendant's arrest and suppress suggestive identification evidence, for not challenging the destruction of exculpatory evidence, not calling witnesses to testify to the misidentification of defendant and not consulting defendant before making statements during opening arguments that defendant contended admitted his guilt.

The public defender also filed a motion alleging that a new trial was warranted because the State made prejudicial comments during closing argument, defendant was not proven guilty beyond a reasonable doubt, and no evidence was presented at trial that the BB gun was used as a bludgeon, as averred in defendant's indictment. The trial court subsequently allowed the public defender's office to withdraw and appointed Steven Decker as defendant's counsel.

Decker filed a supplemental motion for a new trial, which incorporated defendant's *pro se* motion and the public defender's motion. Decker's motion also alleged, in part, that trial counsel was ineffective in failing to call Compton as a witness after indicating that they would do so during opening statements and for failing to explain his nonappearance.

On April 13, 2004, at the hearing on the motion for a new trial, APD Thomas testified that prior to defendant's trial, he developed a trial strategy of misidentification because the witnesses' descriptions of the perpetrator of the vehicular hijacking more closely resembled Dennis Compton than the defendant. Thomas testified that he interviewed Compton on the day before the trial started and on the first day of the trial. Thomas testified that during their conversations, Compton contradicted himself several times and made statements that led Thomas to believe that he would be suborning perjury if he put Compton on the witness stand. Another factor in his decision not to present Compton to the jury was the fact that on the day Compton was to testify, he was arrested on a charge of intimidating the prosecution's teenage witness, Georgio Dawson, and Thomas was concerned that the arrest would come out at trial and hurt defendant's case. The day before the trial started, Thomas told defendant that he believed Compton would not be a good witness in his case because of Compton's inconsistent version of events, his inappropriate manner of dressing and speaking, and his tattoos, but that he would call Compton to testify if defendant so requested. Defendant agreed that Thomas should not call Compton to testify.

The trial court denied defendant's motion for a new trial. At sentencing, the State presented certified copies of two of defendant's prior convictions, and he was sentenced to life in prison as an habitual offender.

Defendant appealed his conviction to this court, contending that: (1) he was not proven guilty beyond a reasonable doubt; (2) there was a fatal variance between his indictment and the proof submitted at trial; (3) he was denied effective assistance of counsel when his attorneys said in opening statements that they would produce defendant's look-alike son, Dennis Compton, at trial and would show that

Compton lived near where the truck was recovered but failed to do so; (4) defense counsel was ineffective for failing to properly investigate the case prior to trial when he did not interview Compton until after the trial had begun; (5) defense counsel was ineffective because he did not have a reasonable basis to believe that Compton would testify when he made his opening remarks; (6) defendant was denied a fair trial because of comments made by the State in its closing argument; and (7) section 33B—1 of the Criminal Code of 1961 (720 ILCS 5/33B—1 (West 2002)), pursuant to which defendant was sentenced to natural life, deprived him of his constitutional right to a jury and to due process.

On March 30, 2006, this court issued an opinion affirming defendant's conviction. *People v. Ligon*, 365 Ill. App. 3d 109 (2006). This court rejected defendant's contention that he was denied effective assistance of counsel when his attorneys stated during opening statements that they would produce Compton and then failed to do so, finding that trial counsel's decision was a matter of sound trial strategy. *Ligon*, 365 Ill. App. 3d at 121. However, the court declined to adjudicate defendant's claim that defense counsel was ineffective for failing to properly investigate the case prior to trial when he did not interview Compton until after trial had begun. Noting that "[t]his issue was not specifically raised in defendant's posttrial motion and no evidence pertaining to this particular contention was elicited during the hearing on the motion," this court stated that the issue was more appropriate for consideration in a proceeding for postconviction relief. *Ligon*, 365 Ill. App. 3d at 122. The court also declined to adjudicate "the very closely related contention that defense counsel was ineffective because he did not have a reasonable basis to believe that Compton would testify when he made his opening remarks to the jury." *Ligon*, 365 Ill. App. 3d at 122. The court stated "[a]s with defendant's last contention, we refuse to address this contention because we find that it could more appropriately be addressed in a proceeding for postconviction relief." *Ligon*, 365 Ill. App. 3d at 122.[1]

---

[1]We note that when this court issued its opinion in *People v. Ligon*, 365 Ill. App. 3d 109 (2006), it mistakenly believed that defense counsel had not interviewed Compton prior to trial. On direct appeal, in its opening brief, the appellate defender stated that defendant's trial lawyer did not interview Compton until after opening statements. The People's brief pointed out that defendant had misinterpreted the sequence of events regarding defense attorney's interview of Compton and in its reply brief, the appellate defender correctly stated that the record established that defendant's lawyer had actually interviewed Compton one day prior to opening statements. In its Rule 23 order issued on February 2, 2006 (and subsequently withdrawn), this court

On March 8, 2007, defendant filed a *pro se* petition for postconviction relief, alleging that the statute used in his sentencing was unconstitutional and that his appellate counsel was ineffective for failing to argue the unconstitutionality of the sentencing statute on appeal. Defendant did not raise the two issues regarding ineffectiveness of trial counsel that this court stated would be appropriate in a postconviction proceeding. The petition was summarily dismissed. This appeal followed.

## II. ANALYSIS

Defendant raises only one issue on appeal: whether after this court decided not to adjudicate two of his ineffective assistance of counsel claims finding that they would be more appropriately decided in a proceeding under the Post-Conviction Hearing Act, the equal protection and due process clauses of the constitution required that counsel be appointed to help defendant prepare his postconviction petition. Before addressing that issue, however, we must first determine whether, as the State contends, defendant forfeited his ineffective assistance of counsel claims by failing to set them forth in his postconviction petition.

### A. Waiver of Ineffective Assistance of Counsel Claims

The Illinois Post-Conviction Hearing Act provides a mechanism by which those under criminal sentences in this state can assert that their convictions were the result of substantial denial of their rights under the United States Constitution, the Illinois Constitution or both. 725 ILCS 5/122—1 *et seq.* (West 2006). Proceedings under the Act are commenced by the filing of a petition in the circuit court in which the original proceeding took place. Section 122—2 of the Act provides that "[t]he petition shall *** clearly set forth the respects in

---

stated, "We decline to adjudicate defendant's *** contention that defense counsel was ineffective for failing to properly investigate the case prior to trial when he did not interview Compton until after trial had begun." On March 23, 2006, defendant's counsel filed a petition for rehearing but did not bring this error to the court's attention and instead stated, "As this court acknowledged, defense counsel did not interview Compton until *after* trial had begun." (Emphasis added.) Defendant also stated that "the fact that counsel failed to interview Dennis Compton before the promise [to the jury] was made belies this court's finding that counsel was effective." After denying defendant's petition for rehearing, this court issued its opinion declining to adjudicate two of defendant's ineffectiveness of counsel claims and incorrectly stating that the record did not contain evidence "that Compton was, in fact, available to be interviewed prior to commencement of trial." *Ligon*, 365 Ill. App. 3d at 122.

which petitioner's constitutional rights were violated." 725 ILCS 5/122—2 (West 2006). A *pro se* litigant need only present the gist of a constitutional claim to survive the summary dismissal stage of section 122—2.1. *People v. Porter*, 122 Ill. 2d 64, 73 (1988). This threshold is a low one—defendant need only present a modest amount of detail and need not make legal arguments or cite to legal authority. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996).

Section 122—3 of the Act provides that "[a]ny claim of substantial denial of constitutional rights not raised in the original or amended petition is waived." 725 ILCS 5/122—3 (West 2006). Our supreme court has held that although it has the power to excuse an appellate waiver resulting from a failure to include an issue in a postconviction petition, the appellate courts do not. *People v. Jones*, 213 Ill. 2d 498, 505 (2004). The court expressly stated in *Jones*, "our appellate court[s] [are] not free, as this court is under its supervisory authority, to excuse, in the context of postconviction proceedings, an appellate waiver caused by the failure of a defendant to include issues in his or her postconviction petition." *People v. Jones*, 213 Ill. 2d 498, 508 (2004). As a result, this court may not address the issues defendant failed to raise in his postconviction petition.

We reached a similar conclusion based on similar facts in *People v. Burns*, 332 Ill. App. 3d 189 (2001). In *Burns*, defendant was convicted of first degree murder and attempted robbery. On appeal, defendant argued that his trial lawyer was ineffective for failing to present evidence that one of his accomplices may have been in jail at the time of the crime and that because this information would have discredited his own inculpatory statement, he was prejudiced and should receive a new trial. The appellate court held that defendant's contention would be more appropriately addressed in a postconviction proceeding, because its disposition required consideration of matters beyond the record on direct appeal. Defendant filed a postconviction petition but failed to raise the ineffectiveness claim. The trial court dismissed the petition as frivolous and patently without merit. On defendant's appeal from that dismissal, this court held that because the defendant failed to raise the ineffective assistance claim in his petition, it was waived pursuant to section 122—3 of the Act (725 ILCS 5/122—3 (West 2006)). *Burns*, 332 Ill. App. 3d at 191. This court also rejected defendant's argument that his failure to raise the issue in his postconviction petition was due to his scant educational background, because the record showed that defendant was fully competent to stand trial, that competency was never raised as an issue, and his postconviction petition exhibited a full understanding of his case and his legal rights. *Burns*, 332 Ill. App. 3d at 92.

■ Similarly, in this case this court explicitly stated in its March 30, 2006, opinion that defendant's ineffective assistance of counsel arguments "could more appropriately be addressed in a proceeding for postconviction relief." *Ligon*, 365 Ill. App. 3d at 122. By failing to raise those claims in his *pro se* postconviction petition, the defendant has waived them, and this court does not have authority to excuse that waiver.

Defendant is not without recourse, however. "A defendant who fails to include an issue in his original or amended postconviction petition, although precluded from raising the issue on appeal from the petition's dismissal, may raise the issue in a successive petition if he can meet the strictures of the 'cause and prejudice' test.' " *People v. Jones*, 211 Ill. 2d 140, 148-49 (2004). "Under this test, the defendant must demonstrate 'cause' for failing to raise the error in prior proceedings and actual 'prejudice' resulting from the claimed error." *Jones*, 211 Ill. 2d at 149 citing *People v. Orange*, 195 Ill. 2d 437, 449 (2001). " '[T]he cause-and-prejudice test is the analytical tool that is to be used to determine whether fundamental fairness requires that an exception be made to section 122—3 so that a claim raised in a successive petition may be considered on its merits.' " *Jones*, 211 Ill. 2d at 148-49, quoting, *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002).

### B. Defendant's Right to Appointed Counsel

The sole issue raised by defendant in this appeal is whether the equal protection and due process clauses of the constitution required that counsel be appointed to represent him in his postconviction proceeding. In noncapital criminal cases, the Post-Conviction Hearing Act (725 ILCS 5/122—1 *et seq.* (West 2006)) establishes a three-step procedure for a defendant to challenge a conviction based on a substantial denial of constitutional rights. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006). If the circuit court determines that a *pro se* petition states the gist of a constitutional claim, the petition moves to the second stage, where counsel may be appointed if the petitioner so requests and is indigent. 725 ILCS 5/122—2.1(b), 122—4 (West 2006); *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). At the second stage, if a substantial showing of a constitutional violation is made, a third-stage evidentiary hearing is ordered. 725 ILCS 5/122—6 (West 2006).

Defendant concedes that the general rule, as well established by our supreme court and the United States Supreme Court, is that neither fundamental fairness nor due process considerations require that an attorney be appointed for postconviction petitioners. *People v. Jones*, 211 Ill. 2d 140, 148 (2004); *Pennsylvania v. Finley*, 481 U.S. 551, 555, 95 L. Ed. 2d 539, 545, 107 S. Ct. 1990, 1993 (1987) ("the

right to appointed counsel extends to the first appeal of right, and no further"). Regarding the appointment of counsel our supreme court has stated:

> "There is no constitutional right to the assistance of counsel in postconviction proceedings; the right to counsel is wholly statutory [citation] and petitioners are only entitled to the level of assistance provided for by the Post-Conviction Hearing Act (Act) [citations]. The Act provides for a reasonable level of assistance. [Citation.] To ensure that postconviction petitioners receive this level of assistance, Rule 651(c) imposes specific duties on postconviction counsel." *People v. Suarez*, 224 Ill. 2d 37, 42 (2007).

Defendant contends, however, that in light of the United States Supreme Court's opinion in *Halbert v. Michigan*, 545 U.S. 605, 162 L. Ed. 2d 552, 125 S. Ct. 2582 (2005), and the "unique circumstances" of his case, the due process and equal protection clauses of the constitution required the appointment of counsel to assist him in preparing his postconviction petition.

In *Halbert*, the Court addressed whether indigent criminal defendants who seek first-tier review in the Michigan Court of Appeals after pleading guilty or *nolo contendere* have a constitutional right to appointed counsel. Michigan has a two-tier appellate system, consisting of the Michigan Supreme Court, which hears appeals by leave of court, and the Court of Appeals. Prior to 1994, the Court of Appeals adjudicated appeals as of right from all criminal convictions. To reduce the workload of that court, a voter-approved 1994 amendment to the state constitution provided that an appeal by a defendant convicted on a guilty or *nolo contendere* plea would be heard only by leave of the court.

The defendant in *Halbert* pleaded *nolo contendere* to two counts of second degree criminal sexual assault. During defendant's plea colloquy, the trial court advised him of certain instances in which it "must" or "may" appoint counsel, but failed to tell him that it could not appoint counsel in other circumstances, including in defendant's own case should he appeal. Defendant's counsel requested that defendant's sentences run concurrently, but the trial court set the sentences to run consecutively. The day after sentencing, defendant moved to withdraw his plea. The trial court denied the motion, stating that defendant's proper remedy was to appeal to the state court of appeals.

Twice thereafter, the defendant asked the trial court to appoint counsel to help him prepare an application for leave to appeal. The trial court denied defendant's motion, citing *People v. Bulger*, 462 Mich. 495, 506, 614 N.W.2d 103, 108 (2000), in which the Michigan

Supreme Court held that the fourteenth amendment's equal protection and due process clauses do not secure a right to appointed counsel to pursue a discretionary appeal. The defendant then filed a *pro se* application for leave to appeal and sought, *inter alia*, remand for appointment of appellate counsel. The court of appeals denied defendant's application for "lack of merit in the grounds presented." *Bulger*, 462 Mich. at 121 n.13, 614 N.W.2d at 536 n.13. The Michigan Supreme Court declined review.

The United States Supreme Court vacated the judgment of the Michigan Court of Appeals and held that the due process and equal protection clauses of the United States Constitution require the appointment of counsel for defendants, convicted on their pleas, who seek access to first-tier review in the Michigan Court of Appeals. *Halbert*, 545 U.S. at 616-17, 162 L. Ed. 2d at 564, 125 S. Ct. at 2590. The Court noted that defendant's case was framed by two prior Supreme Court decisions concerning state-funded appellate counsel, *Douglas v. California*, 372 U.S. 353, 9 L. Ed. 2d 811, 83 S. Ct. 814 (1963), and *Ross v. Moffitt*, 417 U.S. 600, 41 L. Ed. 2d 341, 94 S. Ct. 2437 (1974). In *Douglas*, the Court held that a state must appoint counsel for an indigent defendant's first-tier appeal as of right (*Douglas*, 372 U.S. at 357, 9 L. Ed. 2d at 814, 83 S. Ct. at 816), while in *Ross*, the Court held that a state need not appoint counsel to aid an indigent person in discretionary appeals to the state's highest court, or in petitioning for review in the Supreme Court (*Ross*, 417 U.S. at 615, 41 L. Ed. 2d at 353-54, 94 S. Ct. at 2246).

Michigan contended that because appeals to its Court of Appeals required leave of court they were discretionary, and pursuant to *Ross*, counsel need not be appointed. The Court disagreed and found that "*Douglas* provide[d] the controlling instruction" (*Halbert*, 545 U.S. at 616-17, 162 L. Ed. at 564, 125 S. Ct. at 2590) because Halbert sought first-tier review on the "merits" of his conviction and, unlike subsequent appellate stages, his claims had not yet " 'been presented by [appellate counsel] and passed upon by an appellate court' " (*Halbert*, 545 U.S. at 611, 162 L. Ed. 2d at 560, 125 S. Ct. at 2587, quoting *Douglas*, 417 U.S. at 356, 9 L. Ed. 2d at 814, 83 S. Ct. at 816). The Court held that such indigent criminal defendants are entitled to appointed counsel pursuant to the due process and equal protection clauses of the constitution. *Halbert*, 545 U.S. at 610, 162 L. Ed. 2d at 560, 125 S. Ct. at 2586-87.

Defendant contends that in light of the holding in *Halbert*, counsel should have been appointed to assist him in preparing his postconviction petition. Defendant argues that by deciding not to consider his claims on direct appeal and relegating them to a postconviction

proceeding, this court effectively created a discretionary review process, requiring him to make a preliminary showing of merit before he could secure his first direct review of those claims. Defendant contends that pursuant to *Halbert*, this procedure can pass constitutional muster only if counsel is appointed to prepare the petition seeking discretionary review. We disagree.

In *Halbert*, the defendant requested that an attorney be appointed to assist in his initial appellate review, and in deciding that counsel should be appointed, the Court contrasted the very different procedural positions of a *pro se* defendant seeking first-tier review and a *pro se* defendant seeking second-tier review. The Court stated that a defendant seeking second-tier review will have had the assistance of appellate counsel at his first-tier review and that counsel "will have reviewed the trial record, researched the legal issues, and prepared a brief reflecting that review and research." *Halbert*, 545 U.S. at 619, 162 L. Ed. 2d at 565, 125 S. Ct. at 2592, citing *Ross*, 417 U.S. at 615, 41 L. Ed. 2d at 353-54, 94 S. Ct. at 2446. That defendant "may also be armed with an opinion of the intermediate appellate court addressing the issues counsel raised." *Halbert*, 545 U.S. at 619, 162 L. Ed. 2d at 565, 125 S. Ct. at 2592. Conversely, "a first-tier review applicant, forced to act *pro se*, will face a record unreviewed by appellate counsel, and will be equipped with no attorney's brief prepared for, or reasoned opinion by, a court of review." *Halbert*, 545 U.S. at 619, 162 L. Ed. 2d at 565, 125 S. Ct. at 2592. Such a defendant would not have meaningful access to the appellate court system. *Halbert*, 545 U.S. at 619, 624, 162 L. Ed. 2d at 565, 568, 125 S. Ct. at 2592, 2594.

The defendant in this case, unlike the defendant in *Halbert*, had a direct appeal of his conviction to this court, with the assistance of appointed counsel. Therefore, when preparing his *pro se* petition, defendant had copies of the petition for leave to appeal drafted by his appellate lawyer, which included 4$\frac{1}{2}$ pages on the issue of ineffective assistance of counsel and copies of his appellate counsel's opening and reply briefs. Defendant also had the benefit of the petition for rehearing in which his appellate lawyer argued that defendant's trial counsel was ineffective. Lastly, defendant had this court's published opinion, which set forth the two ineffectiveness claims and expressly stated that they could "more appropriately be addressed in a proceeding for postconviction relief." *Ligon*, 365 Ill. App. 3d at 122. As a result, defendant had significantly more guidance than the defendant in *Halbert*, who was seeking first-tier review without the assistance of appellate counsel.

Furthermore, the defendant in *Halbert* faced far more daunting legal hurdles than the defendant in the present case. Under Michigan

law, the defendant in *Halbert* was required to state in his application for leave to appeal (1) a concise recitation of his allegations of error and the relief sought; and (2) a concise argument in support of his position on each issue. *Halbert*, 545 U.S. at 622, 162 L. Ed. 2d at 567, 125 S. Ct. at 2593. The application form provided by the state of Michigan instructed the person seeking appellate review to " ' "state the law that supports your position and explain how the law applies to the facts of your case." ' [Citation.]" *Halbert*, 545 U.S. at 622, 162 L. Ed. 2d at 567, 125 S. Ct. at 2593-94. Conversely, in this case, although a petition for postconviction relief in Illinois must state the respects in which the petitioner's constitutional rights were violated (725 ILCS 5/122—2 (West 2006)) to survive dismissal at this stage, "a petition need only present the gist of a constitutional claim." *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996), citing *People v. Porter*, 122 Ill. 2d 64, 74 (1988). "This is a low threshold and a defendant need only present a limited amount of detail in the petition. At this stage, a defendant need not make legal arguments or cite to legal authority." *Gaultney*, 174 Ill. 2d at 418, citing *Porter*, 122 Ill. 2d at 74.

■ For the foregoing reasons, defendant's position in filing his *pro se* postconviction petition seeking collateral and second-tier review of his claims was not analogous to the defendant in *Halbert*, who was seeking first-tier review of his conviction. Defendant had the benefit of court-appointed counsel during his first-tier appeal, and there is no support for his argument that the constitution mandates appointment of counsel for a defendant seeking second-tier, discretionary review. Therefore, we find that the due process and equal protection clauses of the constitution did not require that counsel be appointed to assist defendant in preparing his postconviction petition.

## III. CONCLUSION

For the reasons set forth above, we find that defendant may not raise his ineffective assistance of counsel claims for the first time in this appeal and accordingly affirm the order of the circuit court dismissing defendant's postconviction petition. We also find, pursuant to *People v. Suarez*, 224 Ill. 2d 37, 42 (2007), that defendant did not have a constitutional right to the assistance of court-appointed counsel in preparing that petition.

Affirmed.

MURPHY, P.J., and COLEMAN, J., concur.