2022 IL App (1st) 192299-U

FIFTH DIVISION
Order filed: March 25, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 01 CR 2559 |
| DENNIS LIGON, | ) ) ) | Honorable, James Michael Obbish, |
| Defendant-Appellant. | ) ) | Judge, presiding. |

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Delort and Justice Connors concurred in the judgment.

**ORDER**

¶ 1 *Held*: We affirm the third-stage denial of the defendant's successive postconviction petition where the circuit court did not err when it found that the defendant had not established prejudice as the result of trial counsels' failure to call a witness mentioned during opening statements.

¶ 2 The defendant, Dennis Ligon, appeals from an order of the circuit court of Cook County, denying his successive postconviction petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)), following a third-stage evidentiary hearing. For the reasons that follow, we affirm.

¶ 3 The facts of this case are set forth in this court's opinion in *People v. Ligon*, 365 Ill. App. 3d 109 (2006) (*Ligon I*). We repeat those facts here, with additional material relevant to the issue in the case before us.

¶ 4 The defendant was charged with aggravated vehicular hijacking (720 ILCS 5/18-4 (West 2000)) and the matter proceeded to a jury trial.

¶ 5 At trial, defense counsel assistant public defender (APD) Camille Calabrese, made an opening statement in which she asserted that this was a classic case of misidentification, and that the defendant had a son, Dennis Compton,  who resembled the defendant. Specifically, she told the jury:

> "Now, we believe that we are going to be able to produce Dennis Compton for you. Mr. Compton has been subpoenaed. And I'm confident that after you hear the testimony of Mr. Compton, the son of Dennis Ligon, you will have more than reasonable doubt as to whether or not it was in fact Mr. Ligon who possessed that automobile that day indeed, let along [*sic*] whether or not it was he who took the automobile on December 16th.

> Mr. Ligon may be guilty of protecting his son but that doesn't mean that he's guilty of having taking [*sic*] this automobile. And I'm confident that at the close of the evidence your verdict is gonna be not guilty."

¶ 6 During trial, Ana Diaz testified that, on December 16, 2000, at 1:15 pm she drove her red Ford 150 pickup truck into a parking lot on Western Avenue in Chicago. As she was looking for a parking space, Diaz noticed an individual she later identified as the defendant standing nearby. Diaz parked and was getting out of her truck when she was approached from behind by the defendant, who blocked her from exiting her truck and told her to leave the keys in the ignition and to get out. Diaz stated the defendant was very close to her, looking at her in the eye. Diaz

testified that the defendant had nothing covering his face. Diaz felt the defendant pushing something into her ribs. When she heard a click, she looked down and saw a gun in the defendant's hand. Diaz testified, she screamed, handed the defendant her keys, and moved away from the truck. As the defendant drove away in Diaz' truck, he hit another car. Diaz borrowed a phone to call the police. Diaz testified Humberto Perez came to her assistance, following the defendant for several blocks before losing sight of the truck. On January 3, 2001, Diaz went to the police station to view a lineup. She testified that she identified the defendant out of a lineup as the man who had stolen her truck. At trial, Diaz made an in-court identification of the defendant, identified the defendant in a picture of the lineup and identified a BB gun as the gun the defendant had pushed into her ribs. On cross-examination, Diaz testified that she made the identification at the lineup in less than two minutes. On redirect examination, she testified that she will never forget the defendant's face.

¶ 7 Humberto Perez testified that, on December 16, 2000, he was leaving a store on Western Avenue and walking across the parking lot when he saw Diaz sitting in a truck with a man very close to her. He did not see the man's face. Perez testified he got into his car and then heard a scream. He rolled down his window and asked Diaz what was happening. Perez stated that she replied that a man had stolen her pickup truck. Perez followed the truck for several blocks but lost sight of it after it passed through a red light. On cross-examination, Perez testified that he never identified anyone in connection with the vehicular hijacking.

¶ 8 Georgio Dawson, a 13-year-old boy, testified that he knew the defendant. Dawson stated that, on January 2, 2001, at 8 p.m., the defendant was babysitting him while his mother worked. He stated that he and the defendant went for a ride in a red Ford truck. Dawson testified he had also ridden in the truck a few weeks earlier when the defendant had taken him and his mother grocery

shopping. Dawson testified that he and the defendant picked up a man Dawson described as "dark" and "bald" and then stopped while the defendant talked to a woman named Tenita. The defendant told Tenita that he would pick her up later in the evening. Dawson testified that thereafter, he and the defendant dropped off the dark, bald man and picked up the defendant's son, Dennis Compton. Dawson testified that Compton wore his hair in short "twisties", but the defendant had braids. Compton's skin tone was darker than the defendant's skin tone. Dawson stated that after dropping Compton off, he and the defendant picked up Tenita. The defendant then dropped Dawson off at Compton's girlfriend's apartment. Dawson stated that the defendant told him that he would be back in 40 minutes to pick him up. Dawson testified he watched television and fell asleep.

¶ 9 Dawson further testified that, several hours later, he heard a horn honking and looked out of the window and saw the red truck. Dawson went outside and got into the truck. Tenita was in the truck, but the defendant was not. Shortly thereafter, a police car approached the truck. The police officer told Dawson and Tenita to get out of the truck. Dawson stated that the officer searched the truck and found a BB gun. Dawson identified the BB gun at trial. Dawson testified he told the officer that the driver of the truck was named Dennis and went with the police to look for the driver. Dawson stated that the defendant was found near an elevated train station. Dawson testified that, at all times, the defendant was driving the truck and that he never witnessed Compton driving the truck.

¶ 10 On cross-examination, Dawson described the defendant as approximately six foot five inches tall, with light skin and braids, broad in the shoulders. Dawson described Compton as six foot tall, with darker skin and twisties. Dawson testified that Compton is shorter and smaller than the defendant.

¶ 11 Tenita Barber testified that, although she had seen the defendant driving in a red truck several times at the end of December 2000, she first spoke with the defendant on December 31, 2000. Barber next saw the defendant driving the red truck on January 2, 2001, at 9 p.m. She testified that on that occasion, the defendant was with Dawson and a man Barber also described as "dark" and "bald." According to Barber, the defendant told her that he would come back to pick her up at 10:45 p.m. and to come to the truck when she heard him honk. At about 11 p.m., Barber heard the defendant honking and got into the truck. Barber testified that only the defendant and Dawson were in the truck. She stated that she and the defendant dropped Dawson off and proceeded to drive around, drinking alcohol and smoking marijuana. According to Barber, the defendant told her that he had just bought the truck. Eventually, the defendant and Barber drove back to the apartment building where they had left Dawson. Barber testified that the defendant honked the horn but got out of the truck when Dawson did not come out of the building. After the defendant had walked away from the truck, Dawson came out of the building and got into the truck. Barber testified that, shortly thereafter, the police arrived and asked her and Dawson to get out of the truck. As they were searching the truck, Barber heard the police officers say that they had found a BB gun. Barber testified she was arrested and charged with criminal trespass to a vehicle. Barber also stated her belief that the defendant was approximately 32 years old. On crossexamination, Barber testified that she did not know anyone named Dennis Compton.

¶ 12 Timako Cobb, Dawson's mother, testified that she met the defendant in December 2000 and that, when he took her and her son to the grocery store in late December, the defendant was driving a red Ford truck. Cobb stated that, on January 2, 2001, the defendant offered to watch Dawson while Cobb was at work, and that the defendant was still driving the red truck.

¶ 13 Officer Eric Helson testified that, on January 3, 2001, at 5:10 a.m., he and his partner were on duty when they noticed another patrol car stopped near a red Ford truck. He stated that, after talking to the officer who had arrived on the scene earlier, Dawson, and Barber, he and his partner took Dawson to look for the driver. The driver, who Officer Helson identified as defendant, was found standing near the entrance to an elevated train station about a block and a half from the red truck. Officer Helson stated a BB gun was recovered from the driver's side floor of the truck, and he identified the BB gun at trial.

¶ 14 Forensic scientist Debra McGarry, a specialist in latent fingerprints, identified the BB gun as the one that she received for latent print analysis. McGarry testified that there were not latent prints on the BB gun suitable for comparison.

¶ 15 The parties stipulated that Diaz was the owner of the red Ford truck in which Barber and Dawson were riding.

¶ 16 The State rested, and the defense rested without presenting testimony. In closing argument, the State argued that the witnesses were not mistaken in their identification of the defendant. Defense counsel, APD Anthony Thomas, argued that there was no doubt that someone hijacked Diaz' truck. He argued, however, that the State had failed to prove that the person who stole the truck was the defendant. APD Thomas argued that he did not know who took Diaz' truck but that he did not have to know because the defendant was not required to prove his innocence. He argued that the State's witnesses were not credible.

¶ 17 The jury found the defendant guilty of aggravated vehicular hijacking. The defendant filed a *pro se* motion for judgment notwithstanding the verdict, in which he alleged, *inter alia*, that trial counsel was ineffective for failing to move to dismiss his indictment, to move to quash his arrest,

to move to suppress suggestive identification evidence, to challenge the destruction of exculpatory evidence, to call witnesses to testify to the misidentification of him, and to consult with him prior to admitting his guilt in defense counsel's opening statement. APD Thomas also filed a motion for a new trial on the defendant's behalf. Thereafter, the public defender was allowed to withdraw, and a private attorney was appointed to represent the defendant. The attorney filed a supplemental motion for a new trial.

¶ 18     The trial court conducted a hearing on the defendant's motion.

¶ 19 APD Thomas testified that his strategy for the case was based on his belief that the witness descriptions of the offender more closely matched Compton than the defendant. APD Thomas stated that he spoke with Compton in the afternoon on both the first and second days of the defendant's trial. He admitted that APD Calabrese indicated in her opening statement that this was a situation where a father was being held responsible for the actions of his son. APD Thomas testified that the State presented their witnesses and he and APD Calabrese attempted to impeach their identifications. He admitted that he did not call Compton to testify, believing that Compton was not a credible witness and would not be well received by the jury. According to APD Thomas, he spoke with the defendant who agreed that Compton should not be called as a witness. APD Thomas further explained that Compton was arrested on an allegation of intimidating a witness who had previously testified in the defendant's trial, and he worried that evidence of the arrest might come out at trial and harm the defendant's case. APD Thomas could not remember whether he had photographs made of Compton to use in the event that he did not testify.

¶ 20 Compton testified that he had been subpoenaed to testify at the defendant's trial. He stated that he weighed between 170 and 180 pounds and was five foot seven inches tall. On

crossexamination, Compton testified that, had he been called as a witness at the defendant's trial, he would have testified that he was not present at the scene of the vehicular hijacking and did not know who committed the offense. Compton testified that he would not have testified that he committed the offense.

¶ 21 The defendant testified that Compton lived in the area where the truck was recovered. He stated that he never told APD Thomas that it would not be a good idea to call Compton as a witness or display his photograph to the jury. On cross-examination, the defendant testified that Compton "had knowledge" of the truck.

¶ 22 The court denied the motion and sentenced the defendant to life imprisonment. On direct appeal, this court affirmed the defendant's conviction and sentence. See *Ligon I*, 365 Ill. App. 3d at 128. This court did not address the issues of whether trial counsel was ineffective for suggesting that Compton would testify without a reasonable basis to believe that he would. *Id.* at 122. This court concluded that the issue was better suited to a postconviction petition because the record had not been fully developed. *Id.* Our supreme court denied the defendant leave to appeal. *People v. Ligon*, No. 102568 (2006).

¶ 23 The defendant filed a petition for a writ of *habeas corpus* in federal court including, *inter alia*, a claim that trial counsel was ineffective. The district court denied the defendant's petition. *Ligon v. Jones*, No. 06 C 5862 (2007) (2007 WL 2351228).

¶ 24 In 2007, the defendant filed a *pro se* petition for postconviction relief, alleging that the Habitual Criminal Act was unconstitutional. The circuit court summarily dismissed the petition. See *People v. Ligon*, 392 Ill. App. 3d 988, 994 (2009) (*Ligon II*).On appeal, the defendant argued only that counsel should have been appointed to assist him with the two claims this court indicated would be better suited to postconviction relief. *Id.* at 994. This court held that the claims were

forfeited because they had not been raised below, noting, however, that the defendant could raise them in a successive postconviction petition if he could meet the "cause and prejudice test." *Id.* at 996. This court further held that the defendant was not entitled to appointed counsel. *Id.* at 1000. The supreme court affirmed. *People v. Ligon*, 239 Ill. 2d 94 (2010) (*Ligon III*).

¶ 25 In 2012, the defendant filed a petition to vacate his conviction pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2008)). He argued that his conviction violated the proportionate penalties clause of the Illinois Constitution because the Class X offense of which he was convicted of had the identical elements as a Class 1 felony. The circuit court dismissed the defendant's petition *sua sponte*. This court reversed, finding that the two offenses had identical elements. *People v. Ligon*, 2014 IL App (1st) 120913, ¶ 10 (*Ligon IV*), rev'd, 2016 IL 118023 (*Ligon V*). The supreme court reversed this court and affirmed the decision of the circuit court. *Ligon V*, 2016 IL 118023, ¶¶ 32-34.

¶ 26 In 2012, the defendant filed a motion for leave to file a successive postconviction petition, which the circuit court granted at the first stage of postconviction proceedings. At the second stage, the State filed a motion to dismiss which the circuit court denied. Thereafter, the circuit court conducted a third-stage evidentiary hearing.

¶ 27 At the hearing, Monalisa Dugue testified that from 2001 to 2003 she worked as a paralegal and reader for the public defender's office, and she was assigned as a reader for APD Thomas, a visually impaired attorney. As part of her duties, she accompanied APD Thomas when he visited the defendant at the jail prior to trial. Dugue testified that, on one occasion, APD Thomas fell asleep during an interview with the defendant. Dugue recalled meeting with Compton once during the trial and described his appearance to APD Thomas. Dugue stated that she told APD Thomas

that Compton had a tattoo on his face. Dugue described Compton and Ligon as having drastically different physiques. Ligon was bigger, had broader shoulders, and was a bit taller.

¶ 28 Dugue also testified that Compton was arrested for intimidating a witness outside the courtroom. Dugue was in the courtroom when a sheriff's deputy told her that a witness had been arrested. After a conversation with Compton in the lockup, a decision was made not to call him as a witness.

¶ 29 APD Calabrese testified that, in 2003, she was employed as an assistant public defender. She stated that APD Thomas asked her to be his "second chair" at the defendant's trial. Together they formulated a defense strategy based on misidentification. APD Calabrese testified APD Thomas spoke with Compton several times by telephone. According to her, both she and APD Thomas felt that, because the case involved a potential life sentence, it was important to put on a strong defense. She stated:

> "we felt the evidence was overwhelming and that we needed to come out asserting a defense and so even though it was very unusual we reasoned that since we had the son there even though there was a risk that he would bail on us we decided to go with the risk because we needed to put on a defense and we did have the son there and so, yes, that is what we went with asserting our defense, that was the primary theory, we wanted to put it on that we had a defense rather than not argue anything."

APD Calabrese stated that they planned to call Compton as a witness until he was arrested for intimidating a witness.

¶ 30 The defendant testified that before trial he met with APD Thomas and a paralegal at the jail. The defendant stated APD Thomas fell asleep during the interview and began snoring. He testified

that he was in Bettendorf, Iowa, at the time of the vehicular hijacking and that he gave APD Thomas a bus ticket that proved his alibi. The defendant stated that he had the bus ticket in his pocket and that he was able to get it into the jail because it was missed during a search. The State objected arguing that it had not been given any notice of an alibi defense and that the line of questioning was improper because it addressed an issue that had not been pled in the defendant's postconviction petition and the circuit court had not ordered a hearing on the issue. The circuit court sustained the objection.

¶ 31 The defendant also testified that Compton had "knowledge" of the truck because it was found in front of his apartment building. The defendant stated that he was taller and a little heavier than Compton. According to the defendant, APD Thomas told him that he intended to use misidentification as a defense. The defendant testified that he was never told why Compton was not called as a witness and never agreed to the strategy of not calling Compton.

¶ 32 Postconviction counsel moved for leave to amend the successive postconviction petition to conform to the proofs and reopen the evidentiary portion of the hearing to present evidence that APD Thomas had been informed of an alibi but failed to investigate. The circuit court granted the motion and conducted a supplemental evidentiary hearing.

¶ 33 Among other exhibits, the defendant presented two affidavits during the hearing. One affidavit purportedly signed by Compton, stating that he took the truck, and adding, in relevant part:

"5. I was willing to testify at my father's trial that I took the red truck even after I was arrested.

6. I was willing to be shown to the jury even after I was arrested.

7. When I testified at the hearing after the trial I was under the influence of drugs and that

is why I said I was not present when the red truck was taken."

The second affidavit signed by the defendant alleged that he was in Bettendorf, Iowa, on December 16, 2000, and took a bus to Chicago on December 17, 2000, where he was picked up by Theresa Johnson. The affidavit stated that he never drove a red truck in December 2000.

¶ 34 Kimberly Ligon, the defendant's wife, testified that, in December 2000, she and the defendant were living together in Bettendorf, Iowa. In December 2000, the defendant took a bus to Chicago. Kimberly could not recall the exact date. She identified photographs of the defendant and Compton and testified that the photographs reflected the way they appeared in 2000.

¶ 35 Kenyana Compton, the defendant's daughter, testified that, in 2000, the defendant called her when he arrived in Chicago. She could not recall the date. Kenyana testified that Compton was her brother and that he and the defendant "looked just alike."

¶ 36 APD Thomas testified that he met with the defendant in the jail and in the lockup at the courthouse. He did not recall either discussing an alibi defense with the defendant or the defendant telling him that he had a bus ticket in his cell. APD Thomas stated the defendant never tried to give him a bus ticket. APD Thomas did recall the defendant saying he lived different places moving back and forth between Illinois and Indiana. However, he did not recall the defendant mentioning that he lived in Iowa. APD Thomas stated that the defendant mentioned Compton as a potential witness. According to APD Thomas, he called Compton several times and left messages, but never spoke to Compton before he got to court. He stated that he did not interview any witnesses prior to trial. APD Thomas testified that APD Calabrese crafted her own opening statement. He stated that he did intended to call Compton as a witness but changed his mind after speaking to Compton

and deciding he was not credible. APD Thomas testified that he did not request a continuance when Compton was arrested because, by then, he had decided not to call him as a witness. He stated that, if the defendant had told him about alibi witnesses, he would have interviewed them.

¶ 37 In response to questioning by the court, APD Thomas testified that the defendant told him that Compton would testify that he was the one driving the truck the night the defendant was arrested. APD Thomas added that he could not get a "straight story" from Compton and suspected that the defendant was "supporting perjury." APD Thomas stated that he did not believe Compton and did not believe a jury would believe him either. APD Thomas testified he was familiar with a police report in which the defendant was noted to have said that he rented the truck from a friend for $80 before Christmas, returned it, and borrowed it a second time after Christmas. APD Thomas noted that a detective attempted to interview the friend and learned from the man's mother that he had been in custody since December 23, 2000, and had never been in possession of a red truck. APD Thomas stated that he was aware that the detectives reinterviewed the defendant and that he stated he was mistaken and must have gotten the truck from someone else.

¶ 38      The defendant testified that when he was paroled in 2000, he had his parole transferred to Iowa and lived in Bettendorf. He stated he had never been to Indiana. The defendant testified his "rap sheet" reflected the parole to Iowa.

¶ 39 On cross-examination, the defendant admitted that he submitted an affidavit in the postconviction proceedings in 2012, and that the affidavit did not mention his being in Iowa at the time of the vehicular hijacking. The defendant also admitted that a 2018 affidavit he submitted in the postconviction proceedings mentioned being in Iowa and that he was picked up from the bus

station by Theresa Johnson. Defendant admitted, however, that he never mentioned Johnson to APD Thomas but contended that was because APD Thomas never asked him.

¶ 40 In response to further questioning by the court, the defendant testified that he filed a *pro se* motion for judgment notwithstanding the verdict because he believed APD Thomas was ineffective. The defendant admitted that, in the 49-page motion, he never mentioned that he was in Iowa when the truck was hijacked.

¶ 41 The defense rested and the State rested without presenting witnesses. Following arguments, the circuit court held that APD Thomas testified credibly that the defendant agreed with the decision not to call Compton during trial. The court also held that there was, based on the photographs, some similarity between the defendant and Compton. The court noted, however that Diaz initially described the offender as 35 years old, and that the defendant was 37 years old at the time of the offense. Compton was 23 years old at the time of the offense. The court held that APD Thomas' trial strategy regarding Compton was "arguably" not well developed and "arguably something that could support a claim for ineffective assistance." The circuit court found, however, that sometimes decisions need to be made "on the fly," and that that was what happened in this case. The court concluded that there was "no reasonable probability that had the opening statement not been made the way it was, that that would have created a reasonable probability that but for the strategy of Mr. Thomas and Ms. Calabrese that the results would have been different."

¶ 42 With regard to the alibi defense, the circuit court held that it did not believe the defendant's testimony that he had a bus ticket which would have proven he was in Iowa at the time of the offense and did not believe the defendant gave APD Thomas a bus ticket.

¶ 43 The court concluded that the evidence against the defendant was overwhelming. The court further found that: "I don't believe that there was a reasonable probability that [but] for counsels' alleged errors that the results would have been different." The court denied the defendant's successive petition for postconviction relief. This appeal followed.

¶ 44 The Act provides a procedure whereby a person in the penitentiary may assert that his conviction was the result of a violation of the federal or state constitution. 725 ILCS 5/122-1 *et seq*. (West 2020); see also *People v, Ruddock*, 2022 IL App (1st) 173023, ¶ 44. Proceedings under the Act are a collateral attack on a final judgment; they are not a substitute for a direct appeal. *People v. Edwards*, 2012 IL 111711, ¶ 21. Proceedings under the Act have three stages. *Ruddock*, 2022 IL App (1st) 173023, ¶ 44. If a postconviction petition survives summary dismissal at stage one and is not dismissed on the state's motion at stage two, the circuit court conducts a stage-three evidentiary hearing. *Id.* At an evidentiary hearing, the defendant must establish by a preponderance of the evidence that he suffered a substantial deprivation of his constitutional rights. *People v. Coleman*, 2013 IL 113307, ¶ 92 (citing *People v. Stovall*, 47 Ill. 2d 42, 27 (1970)).

¶ 45 When a defendant alleges ineffective assistance of counsel, we apply the two-prong test articulated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 138. A defendant must establish that (1) trial counsel's representation fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different. *People v. Enis*, 194 Ill. 2d 361, 376 (2000) (citing *Strickland*, 466 U.S. at 694); see also *People v. Domagala*, 2013 IL 113688, ¶ 36. "A reasonable probability is a probability sufficient to undermine confidence in the outcome, namely, that counsel's deficient performance rendered the

result of the trial unreliable or the proceeding fundamentally unfair." *Enis¸* 194 Ill. 2d at 376. A defendant must also overcome the strong presumption that any challenged action or inaction may have been the product of trial strategy. *People v. Dupree*, 2018 IL 122307, ¶ 44. The failure to satisfy either prong of the *Strickland* test is fatal to a defendant's claim. *Enis¸* 194 Ill. 2d at 377. As a result, if it is easier to dispose of an ineffective-assistance-of-counsel claim on the basis that the defendant has not established sufficient prejudice, we may proceed directly to *Strickland*'s prejudice prong and need not determine whether counsel's performance was deficient. *People v. Johnson*, 2021 IL 126291, ¶ 53.

¶ 46 Claims of ineffective assistance of counsel generally involve mixed questions of law and fact. *Velasco*, 2018 IL App (1st) 161683, ¶ 137. Accordingly, we will disturb the circuit court's factual findings only if they are against the manifest weight of the evidence but will review *de novo* the ultimate determination of whether the defendant was denied the effective assistance of counsel. *Id.*

¶ 47 We conclude that the circuit court did not err in denying the defendant's petition for postconviction relief. First, we note that we do not need to consider the alleged failure to investigate the defendant's alibi. The trial court found that the defendant's testimony regarding the alibi was simply not credible, and the defendant has not raised any arguments regarding the alleged alibi on appeal. Second, we do not believe the defendant can overcome the presumption that the decision not to call Compton was a matter of trial strategy. See *Dupree*, 2018 IL 122307, ¶ 48. APD Thomas testified to numerous reasons why he believed it was not good strategy to call Compton, including the changes in Compton's story, his demeanor, appearance, and perhaps most importantly his arrest for intimidating a witness during the defendant's trial. Therefore, we are tasked with determining

whether the unfulfilled promise to call Compton made in opening statements was an error that "undermine[s] confidence in the outcome." *Enis*, 194 Ill. 2d at 376.

¶ 48 The circuit court found that the evidence was overwhelming. We agree. Diaz testified that she had a clear view of the offender. She immediately identified the defendant in a line up and testified that she would never forget his face. Although there may be a familial resemblance between the defendant and Compton, the circuit court heard testimony that the defendant was heavier and taller and that Compton had a tattoo on his face. Diaz was the only witness who identified the defendant as hijacking her vehicle, but there was additional circumstantial evidence that the defendant was the perpetrator. Cobb, Dawson, and Barber all testified that the defendant was driving a red truck for weeks before he was arrested. In light of the strength of the evidence against defendant, we cannot conclude that there is a reasonable probability that the jury would have found the defendant not guilty if they had not heard APD Calabrese's opening statement in which she suggested Compton would testify at trial. See *Johnson*, 2021 IL 126291, ¶ 54 (quoting *Strickland*, 466 U.S. at 691) (" '[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.' "). Accordingly, we find that the defendant has failed to meet his burden of establishing prejudice. Therefore, we need not consider the question of whether APD Thomas or APD Calabrese's performance fell below professional norms. See *Johnson*, 2021 IL 126291, ¶ 53 ¶

49     For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 50     Affirmed.